EXHIBIT 1

**SUPERIOR COURT OF THE DISTRICT OF COLUMBIA**
**CRIMINAL DIVISION**

|  |  |
|---|---|
| ANTHONY BRAGDON,      ) | |
|                ) | |
|      Petitioner   ) | |
| v.           ) | Criminal Action No. F-4131-91 |
|                ) | |
| UNITED STATES,   ) | |
|                ) | |
|      Respondent.   ) | |
|                ) | |

## MEMORANDUM IN SUPPORT OF PETITION TO SET ASIDE, VACATE, AND/OR CORRECT CONVICTION AND SENTENCE, OR IN THE ALTERNATIVE, FOR A WRIT OF *CORAM NOBIS*

> Michael X. Imbroscio
> D.C. Bar. No. 445474
> COVINGTON & BURLING
> 1201 Pennsylvania Ave., NW
> Washington, DC 20004
> (202) 662-6000
>
> *Counsel for Petitioner*
> *Anthony Bragdon*

March 27, 2002

## TABLE OF CONTENTS

**TABLE OF AUTHORITIES** ................................................................................................. ii

**PRELIMINARY STATEMENT** .......................................................................................... 1

**STATEMENT OF FACTS** ................................................................................................. 3

    I.   Evidence at Trial ................................................................................................ 3

    II.  Closing Statement By the Government ........................................................... 6

    III.  The Lesser Included Offense Charge and the Jury Deliberations ................. 7

    IV.  The Court of Appeals' Decision ....................................................................... 8

    V.  Disclosure of Special Agent Malone's False Testimony .............................. 10

**CLAIMS FOR RELIEF AND ARGUMENTS** .............................................................. 14

    I.   Special Agent Malone's Perjury Violated Mr. Bragdon's Due Process Rights. .............. 14

        A.  Special Agent Malone Committed Perjury. .................................................. 14

        B.  Special Agent Malone's Perjury Is Attributable to the Government. ........... 18

        C.  Special Agent Malone's Testimony Was Material to the Outcome of Trial. .............. 21

    II.  Alternatively, the Court Should Grant Relief Under a Writ of *Coram Nobis* .................. 27

**REQUEST FOR EVIDENTIARY HEARING** ................................................................ 28

**CONCLUSION** .................................................................................................................. 28

## EXHIBITS

A.    Affidavit of Walter F. Rowe

B.    *Bragdon v. United States*, 668 A.2d 403 (D.C. 1995)

C.    Letter from Amy B. Jabloner, Trial Attorney, Department of Justice, to Peter Taylor, Acting Deputy Chief of Sex Offense Section, Apr. 6, 2001

D.    Independent Examiner's Report on Special Agent Malone's Testimony in the *Bragdon* Matter

## **TABLE OF AUTHORITIES**

### **FEDERAL CASES**

*Barbee v. Warden, Maryland Penitentiary*, 331 F.2d 842 (4th Cir. 1964) .................................19

*Berger v. United States*, 295 U.S. 78 (1935) ...................................................................18

*Brady v. Maryland*, 373 U.S. 83 (1963) .........................................................................18

*Curran v. Delaware*, 259 F.2d 707 (3d Cir. 1958) ...........................................................20

*Freeman v. Georgia*, 599 F.2d 65 (5th Cir. 1979) ...........................................................19

*Holleman v. United States*, 721 F.2d 1136 (7th Cir. 1983) ...............................................20

*Kyles v. Whitley*, 514 U.S. 419 (1995) ................................................................... *passim*

*Mooney v. Holohan*, 294 U.S. 103 (1935) .......................................................................18

*Napue v. Illinois*, 360 U.S. 264 (1959) ..........................................................................19

*Pyle v. Kansas*, 317 U.S. 213 (1942) ............................................................................18

*Scheider v. Estelle*, 552 F.2d 593 (5th Cir. 1977) ...........................................................19

*Strickler v. Greene*, 527 U.S. 263 (1999) ..................................................................18, 21

*United States v. Agurs*, 427 U.S. 97 (1976) ............................................................18, 22, 28

*United States v. Bagley*, 473 U.S. 667 (1985) .........................................................18, 21, 22

*United States v. Dunnigan*, 507 U.S. 87 (1993) .........................................................15, 16

*United States v. Morgan*, 346 U.S. 502 (1954) ..............................................................27

*United States v. Smith*, 77 F.3d 511, 316 U.S.App.D.C. 199 (D.C. Cir. 1996) ..........................22

*United States v. Wells*, 519 U.S. 482 (1997) ..................................................................15

*Wedra v. Thomas*, 671 F.2d 713 (2d Cir. 1982) ...............................................................20

### **STATE CASES**

*Bragdon v. United States*, 668 A.2d 403 (D.C. 1995) ...............................................2, 8, 9, 10

*Bragdon v. United States*, 717 A.2d 878 (D.C. 1998) ........................................................10

*Farley v. United States*, 694 A.2d 887 (D.C. 1997) ...........................................................19

*Hsu v. United States*, 392 A.2d 972 (D.C. 1978) ..............................................................15

*United States v. Hamid*, 531 A.2d 628 (D.C. 1987) ...........................................................27

*Whitaker v. United States*, 616 A.2d 843 (D.C. 1992) .........................................................9

### **STATE STATUTES**

D.C. Code § 22-2402(a) ............................................................................................14, 15

D.C. Code § 23-110 ...................................................................................................14, 27

D.C. Code § 24-801-805 ..............................................................................................8, 10

### **MISCELLANEOUS**

*Reports Highlight More Tainted Testimony*, ST. PETERSBURG TIMES, May 3, 2001 ..............10, 12

USDOJ/OIG SPECIAL REPORT: *The FBI Laboratory: An Investigation Into Laboratory
Practices and Alleged Misconduct in Explosives-Related and Other Cases*, Apr. 1997 ...............10

## SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
## CRIMINAL DIVISION

|                          |   |                                    |
|--------------------------|---|------------------------------------|
| ANTHONY BRAGDON,         | ) |                                    |
|                          | ) |                                    |
|          Petitioner      | ) |                                    |
|     v.                   | ) | Criminal Action No. F-4131-91      |
|                          | ) |                                    |
| UNITED STATES,           | ) |                                    |
|                          | ) |                                    |
|          Respondent.     | ) |                                    |
|                          | ) |                                    |

## MEMORANDUM IN SUPPORT OF ANTHONY BRAGDON'S § 23-110 PETITION

### PRELIMINARY STATEMENT

This Petition presents the fundamental issue of whether the Government can keep an individual incarcerated on the basis of perjured testimony by the FBI Examiner who provided the central physical evidence in the case. Petitioner Anthony Bragdon was convicted of attempted rape and a firearms charge in a prosecution in which the sole contested issue was whether sexual intercourse actually took place. FBI Special Agent Michael P. Malone presented the Government's only physical evidence -- carpet fibers found on the complainant's underwear that purportedly came from Mr. Bragdon's apartment -- tending to show that sexual activity did indeed occur. After Mr. Bragdon had spent almost 10 years in prison, the Government disclosed that Special Agent Malone testified falsely in Mr. Bragdon's trial about this physical evidence. Mr. Bragdon respectfully asks this Court to set aside or vacate his conviction and sentence to correct this injustice.

Unlike other situations where there is either (a) ambiguity as to the falsity of the testimony, or (b) uncertainty as to the materiality of the false testimony, in this case there can be no reasonable dispute as to either issue. The Government's own independent report establishes

that Special Agent Malone's testimony was false. Moreover, it is equally indisputable that Special Agent Malone's perjurious testimony was material and likely made the difference between acquittal and conviction.

The record here reflects a deadlocked jury that, after deliberating over three days and being given a *Winters* charge, ultimately reached a compromise verdict on a lesser-included charge given over vigorous defense objection. In finding Mr. Bragdon guilty of the lesser charge of attempted rape but acquitting him on rape and sodomy and other charges, the jury rejected the fundamental component of the complainant's testimony -- that Mr. Bragdon repeatedly raped her. While rejecting that any rape took place, the jury essentially concluded that some kind of attempted sexual contact took place. This outcome was in and of itself bizarre -- so much so indeed that Judge Mack, writing in dissent in Mr. Bragdon's direct appeal, described the verdict as "irrational." *See Bragdon v. United States*, 668 A.2d 403, 407 (D.C. 1995) (Mack, J., dissenting). But this result becomes all the more troubling upon realization that the key testimony that likely led the jury to this result -- expert testimony that there were carpet fibers on the complainant's underwear for which no "other source" likely "even existed" other than the defendant's carpet -- was a gross exaggeration by the FBI Special Agent who testified in the case and insupportable by the actual scientific evidence.

Convictions based even in part on perjured, material testimony by a Government agent, as occurred in this case, violate an accused's due process rights. In these circumstances, Mr. Bragdon's conviction and sentence should not stand.

2

## STATEMENT OF FACTS

I.    Evidence at Trial

The Government's case against Mr. Bragdon focused primarily on the testimony of Corronda Farmer, the complaining witness. Ms. Farmer testified that on April 9, 1991, at approximately 12:30 p.m., she was leaving the Dix Street Academy, located on Brentwood Parkway and Florida Avenue, N.E., when Mr. Bragdon drove past her in a red truck. (Tr. 32-33). According to Ms. Farmer, Mr. Bragdon called out to her from the truck, and they engaged in a brief conversation. (Tr. 33-34). Ms. Farmer then testified that Mr. Bragdon asked her if she wanted a ride, and that when she refused he pointed a gun toward her head, fired it, and demanded that she get into the truck. (Tr. 34-35). Despite the fact that it was the middle of the day, no one else witnessed this incident or heard the gunfire. (Tr. 375).

Ms. Farmer then testified that she and Mr. Bragdon drove to his apartment at 847 19th Street, N.E., stopping at least once at a stoplight. (Tr. 36, 45). According to Ms. Farmer, when they parked outside his apartment, Mr. Bragdon asked her whether she wanted to come inside while he made a phone call, and when she refused he again threatened her with the gun. (Tr. 46). Once inside the apartment, Ms. Farmer stated that Mr. Bragdon went to his closet (where he allegedly placed the gun on the top shelf), and began to search for a safe key and/or the phone number of someone so that he could obtain money to put gas in his car. (Tr. 48-49). During this period, Ms. Farmer stayed in the kitchen near the back door to the apartment and read the newspaper. (Tr. 47-49).

Mr. Bragdon and Ms. Farmer then sat down in the living room, where Mr. Bragdon made one or more telephone calls. (Tr. 51). While waiting for a return phone call, the two talked, and Mr. Bragdon showed Ms. Farmer the clothes in his closet, where she testified she saw the butt of the gun he pointed at her earlier. (Tr. 79). The police later found a "starter"

3

pistol in the closet. (Tr. 213). According to Ms. Farmer, after they had talked for several minutes, Mr. Bragdon retrieved the "blank" gun from the closet, forced her to remove her pants and underwear, and raped her. (Tr. 53-59). Ms. Farmer then testified that she and Mr. Bragdon left the apartment and that he took $10 from her. (Tr. 31, 60). Mr. Bragdon then drove her to a nearby location from where she could walk to a bus stop and take a bus home. (Tr. 65-66).

In addition to Ms. Farmer's testimony, the prosecution offered several witnesses who testified that Ms. Farmer appeared very upset following the alleged attack. Sandra Winston, the mother of one of Ms. Farmer's friends, testified that she spoke with Ms. Farmer on the phone following the alleged rape, and that she was "very upset and crying." (Tr. 104). Ms. Winston also placed a conference call to the police on Ms. Farmer's behalf during this conversation. (Tr. 106). A number of police officers also testified for the prosecution, including Officer Jeffrey Folts, who responded to Ms. Winston's call. Officer Folts testified that when he arrived at Ms. Farmer's home she "appeared to be very upset and shaken," and that she was crying. (Tr. 109). Detective Carl Schanberger, who interviewed Ms. Farmer on the afternoon of April 9, 1991, testified that Ms. Farmer gave him a description of Mr. Bragdon and the car he was driving, and helped him locate Mr. Bragdon's apartment. (Tr. 128-133). Detective Schanberger was then able to search Mr. Bragdon's apartment, where he found a gun located in a closet, as Ms. Farmer described. (Tr. 134-135).[1]

---

[1]    In addition to Officer Folts and Detective Schanberger, a number of police officers testified primarily regarding the chain of custody of various pieces of evidence, including the carpet fibers, Ms. Farmer's clothing, and the gun. Karen Ann Wiggins, a civilian employee of the Metropolitan Police Department, testified that she conducted tests on the gun, which turned out to be a starter pistol. (Tr. 270). The prosecution also played a videotape of a line-up during which Ms. Farmer identified Mr. Bragdon. (Tr. 279).

Dr. Yolande Robertson-Hackney, the doctor who examined Ms. Farmer after the alleged attack, also testified on behalf of the prosecution. Dr. Robertson-Hackney testified that the findings of her medical examination of Ms. Farmer were inconclusive as to whether intercourse had taken place, stating that "[i]t could have been either way." (Tr. 158).

The Government also called Special Agent Michael P. Malone, a hair and fiber expert for the Federal Bureau of Investigations. Special Agent Malone testified that he had found carpet fibers on Ms. Farmer's underwear that "were basically indistinguishable" from the carpet in Mr. Bragdon's apartment.[2] (Tr. 245). Special Agent Malone also testified that he found another fiber on Ms. Farmer's pants, and another in the paper bag into which all of her clothes had been placed. (Tr. 244). Special Agent Malone's testimony also described the tests used to analyze these fibers and to compare them with samples taken from Mr. Bragdon's apartment. (Tr. 242-245). Special Agent Malone testified that the fibers at issue:

> either came from that sample [from Mr. Bragdon's rug] . . . [or] to
> have come from any other source, [it] would have to be another
> carpet sample with exactly the same microscopic characteristics,
> exactly the same composition, exactly the same color and exactly
> the same dye . . . *if that source even existed*, it would also have had
> to have been in contact with the clothing of Corronda Farmer.

(Tr. 247). (emphasis added).

The defense did not dispute that Mr. Bragdon had offered Ms. Farmer a ride outside of the Dix Academy, that they had gone to his apartment, or that he had later dropped her off nearby a bus stop. Mr. Bragdon's defense was simply that he did not force Mr. Farmer to get into his truck with him or to go to his apartment, that they never engaged in any act of sexual

---

[2]    Special Agent Malone also testified that he found no hairs matching Mr. Bragdon on Ms. Farmer's clothes or in the results of a pubic hair "combing" of Ms. Farmer at the hospital. Similarly, no hairs matching Ms. Farmer were found on Mr. Bragdon. (Tr. 240).

intercourse, consensual or otherwise, that Mr. Bragdon did not at any time threaten her with a

gun or any other weapon, and that he did not force her to give him money. (Tr. 27-29).

The defense's witnesses included FBI Special Agent Robert Grispino, a forensic

serology examiner, who testified that he found no blood or semen on Mr. Bragdon's carpet or on

Ms. Farmer's clothing. (Tr. 312-317). In response to Special Agent Malone's testimony, the

defense also called its own fiber expert, Dr. Walter F. Rowe, who primarily discussed the small

number of fibers actually found and the likelihood that the fibers found on Ms. Farmer's

clothing, especially on her underwear, could have been inadvertently transferred from another

piece of clothing due to improper police procedures in collecting the evidence. (Tr. 329-338).

Dr. Rowe conducted the same visual comparison as Special Agent Malone and, based on this

review, did not dispute the conclusion that the fibers had the same characteristics as the carpet

from Mr. Bragdon's apartment. (Tr. 332). Dr. Rowe was not present in the courtroom when

Special Agent Malone testified, and his knowledge of Special Agent Malone's findings was

limited to his examination of the laboratory report and the prosecutor's statement during cross-

examination. (Affidavit of Dr. Walter F. Rowe, attached as Exhibit A hereto).

II.    Closing Statement By the Government

Recognizing the strength of Special Agent Malone's testimony, the prosecutor

highlighted it in her closing argument. Noting that Special Agent Malone's testimony

corroborated Ms. Farmer's story, she stated that "the carpet fibers that were found on Corronda

Farmer's clothing . . . overwhelmingly in all likelihood, came from the carpet in Mr. Bragdon's

home." (Tr. 367). After explaining that the source of the fibers was not in dispute, she asked the

jury to focus on how fibers from Mr. Bragdon's rug could be found on Ms. Farmer's underwear:

> [I]sn't the important point that they came from some piece of
> clothing, some part of her clothing touched the carpet. And how
> could it? There's no evidence she sat on the floor. She told you

6

that she was laid on the floor when he raped her, with only her shirt on . . . top and her bra. Her pants, both pairs of pants, underpants and the outerpants, pulled down. *The only way that those fibers could have gotten on any of that clothing, whether it was the underpants, the shirt, the outer pants was if she was laying on the floor.*

(Tr. 367-368) (emphasis added). In a case that otherwise relied on inconclusive and/or inconsistent testimony by the examining physician and other observational testimony to corroborate the complaining witness's apparent emotional distress after the alleged rape, Special Agent Malone's unequivocal testimony regarding the only possible source of the fibers found on Ms. Farmer's clothing played a critical role in making the prosecution's theory "fit[] together." (Tr. 374).

III.    The Lesser Included Offense Charge and the Jury Deliberations

Mr. Bragdon was not charged with attempted rape.[3] Instead, the trial court added the lesser included charge of assault with intent to commit rape over Mr. Bragdon's objection. (Tr. 355-357). As defense counsel noted, "[t]he complaining witness said that there was vaginal penetration three separate times. That doesn't leave room for a lot -- that doesn't leave room for interpretation." (Tr. 355). Therefore, the defense argued that "there [was] just no basis . . . for the jury finding that there was an attempted penetration, but not actual penetration, based on what the complaining witness says." (Tr. 356). The court rejected this argument, instead finding

---

[3]    Mr. Bragdon was indicted on charges of assault with a dangerous weapon, kidnapping while armed, rape while armed, sodomy, assault with intent to commit sodomy while armed, armed robbery, and possession of a firearm during a crime of violence or dangerous offense. He was also indicted on charges of first degree theft, unauthorized use of a vehicle, and receiving stolen property. The charges of unauthorized use of a vehicle and receiving stolen property were subsequently severed. The charges for first degree theft and receiving stolen property were eventually dismissed, and the charge of unauthorized use of a vehicle was reduced to attempted UAV, to which Mr. Bragdon pleaded guilty.

sufficient evidence for the jury to find Mr. Bragdon guilty of the lesser included offense. (Tr. 357).

The circumstances of the jury deliberations indicate that the jury clearly struggled with the facts of the case and ultimately reached a compromise verdict. The jury began deliberating on the afternoon of Friday, March 6, 1992. (Tr. 321). By Monday morning, March 9, 1992, the jury reported to the trial judge that it had reached a verdict on two charges, but that it was "sharply divided on the remaining charges." (Tr. Mar. 9, 1992 at 2). The trial court took the partial verdict, in which the jury acquitted Mr. Bragdon of two of the most serious charges, rape while armed and intent to commit sodomy while armed. The trial court ordered continued deliberations, but later that afternoon, the jury again reported to the court that "we have tried to reach verdicts on all the remaining charges, but are [] deadlocked." (Tr. Mar. 9, 1992 at 6). The trial court denied defense counsel's request for a mistrial, gave the jury a *Winters* charge, and ordered further deliberations.

Ultimately, on Tuesday morning, March 10, 1992, the jury acquitted Mr. Bragdon of all but two of the remaining charges. The jury returned guilty verdicts on the counts of (1) carrying a firearm during a crime of violence; and (2) the lesser included offense of assault with intent to commit rape. Following the jury's verdict, the Court sentenced Mr. Bragdon to serve 15 years on each of the two counts under the Youth Rehabilitation Act. D.C. Code § 24-801-805. Mr. Bragdon is currently serving this sentence at FCI Edgeville in Edgeville, South Carolina. He is scheduled to be paroled on May 6, 2002.

IV.    The Court of Appeals' Decision

Mr. Bragdon appealed his conviction, arguing that the trial court erred when it instructed the jury on the assault with intent to rape charge over his objection. The Court of Appeals, over the dissent of Judge Mack, affirmed the conviction. *See Bragdon v. United States*,

8

668 A.2d 403, 404 (D.C. 1995). The Court ruled that the jury could have -- within the bounds of rationality -- acquitted Mr. Bragdon of the armed rape charge and then nonetheless found him guilty of the lesser offense of armed assault with intent to commit rape. *Id.* The court explained that "[t]he testimony of the examining doctor and some forensic evidence [the lack of blood or semen] provide the requisite basis for giving the lesser-included offense instruction." *Id.* This testimony, the court believed, could support the conclusion that Mr. Bragdon attempted to penetrate Ms. Farmer but failed. Furthermore, "[i]n weighing the evidence, the jury was free to credit some portions of the victim's testimony while discrediting others." *Id.* at 406 (citing *Whitaker v. United States*, 616 A.2d 843, 854 (D.C. 1992)). The court concluded that the jury could have believed Ms. Farmer's testimony that there had been forceable sexual contact, but they could disbelieve that there was any vaginal penetration. *Id.*

Judge Mack's dissent rejected the majority's interpretation of the evidence and argued that there was no rational way in which to reconcile Ms. Farmer's testimony with the jury's verdict. *Id.* at 408. He explained:

> This case was prosecuted upon an indictment for armed rape; the defense was a denial of any sexual activity. The evidence of "penetration" was not a contested issue in this context. The government's only eyewitness (the alleged victim) testified unequivocally that penetration occurred . . . There was no other testimony to support or refute this claim.

*Id.* Judge Mack wrote that, "the jury's verdict of guilt . . . is precisely the kind of compromise verdict this court has found to be incompatible with our notion of justice." *Id.* at 407. Judge Mack also cited the jury's problems in reaching a verdict in support of this conclusion, arguing that "[t]he suggestion of compromise and prejudice is apparent here not only from the substantive facts but from the circumstances that developed at trial, including the jury's

deliberation." *Id.* at 410.[4] (The Court of Appeals decision is attached as Exhibit B to this Memorandum).

V.    Disclosure of Special Agent Malone's False Testimony

In 1997, the Department of Justice Office of the Inspector General ("OIG") completed a sweeping investigation of the FBI Laboratory following the Frederick Whitehurst matter. As part of that investigation, the Criminal Division of the Department of Justice and the FBI reviewed cases that resulted in convictions in which FBI examiners who were individually criticized by the OIG performed laboratory examinations. The FBI then contracted with "qualified independent forensic scientists" to review the work of criticized examiners in cases in which their testimony was determined to be "material to a conviction." *See* Letter from Amy B. Jabloner, Trial Attorney, Department of Justice, to Peter Taylor, Acting Deputy Chief of Sex Offense Section, Apr. 6, 2001. (Attached as Exhibit C to this Memorandum).

One of the examiners criticized by the OIG report was Special Agent Michael Malone. For example, the OIG's report stated that Special Agent Malone's testimony in an unrelated case was "incorrect and misleading in several respects." *See* USDOJ/OIG SPECIAL REPORT: *The FBI Laboratory: An Investigation Into Laboratory Practices and Alleged Misconduct in Explosives-Related and Other Cases*, Apr. 1997, at 14, *available at* http://www.usdoj.gov/oig/fbilab1/00exesum.htm. *See also Reports Highlight More Tainted Testimony*, ST. PETERSBURG TIMES, May 3, 2001, *available at* 2001 WL 6975797 (reporting that

---

[4]    In later proceedings, Mr. Bragdon sought to correct or reduce his sentence, arguing that his Youth Rehabilitation Act sentences should run concurrently. D.C. Code. § 24-801-805. In a subsequent appeal, the Court of Appeals rejected this argument and affirmed that Mr. Bragdon's sentences would run consecutively. *See Bragdon v. United States*, 717 A.2d 878 (D.C. 1998).

the Justice Department report showed that Special Agent Malone gave "improper court

testimony" in a capital murder case).

Because the Justice Department determined that Special Agent Malone's

testimony in this case was "material to [Mr. Bragdon's] conviction," the FBI commissioned an

independent review of his laboratory work and testimony. Independent forensic scientist Steve

Robertson conducted the review and issued a report that concluded that most of Special Agent

Malone's testimony concerning the fiber evidence presented in this case was both inaccurate and

misleading. (Attached as Exhibit D to this Memorandum).

As the independent report concluded, Special Agent Malone systematically

misled the jury as to the results and meaning of his forensic comparisons. Special Agent Malone

explained that the fibers found on the complainant's clothes were "trilobal" fibers, and that only

carpet fibers were made in this "trilobal" shape. Moreover, he told the jury that while there is

tremendous variability in the cross-sectional shape of these kinds of trilobal fibers, there was

absolutely no variation between the fibers recovered from Ms. Farmer's clothing and Mr.

Bragdon's carpet:

> Q:     You referred to trilobel [sic] nylon. Is there any particular
> significance in the fibers being that trilobel [sic] nylon?
>
> A:     Yes. Now, trilobel [sic] refers to the cross sectional shape
> of the fiber . . . This shape is very significant, because this is the
> shape that -- in which carpet fibers are made. No other type of
> fiber I know, except for carpet fibers, are made in this trilobel [sic]
> shape. And this trilobel [sic] shape can vary tremendously with the
> width of the lobe lengths, actually shape itself.
>
> Q:     With those variations you just referred to, did you notice
> any variation at all between the fiber you detected on the
> government's items identified as clothing and the carpet sample?
>
> A:     No. There was absolutely none. They were basically
> indistinguishable in all their characteristics.

11

(Tr. 245). Special Agent Malone went on to reiterate his conclusions:

> Q:    Based upon your examination results . . . and your experience in this area, can you reach any conclusions as to whether or not the fibers on the clothing came from the same carpet that the carpet sample was taken from?
>
> A:    They are consistent with coming from the carpet sample . . . They either came from that sample, so to have come from any other source, would have to be another carpet sample with exactly the same microscopic characteristics, exactly the same composition, exactly the same color and exactly the same dye as [the carpet from Mr. Bragdon's apartment]. And again, *if that source even existed*, that other source would also have had to have been in contact with the clothing of Corronda Farmer.

(Tr. 247). (emphasis added).

In short, Special Agent Malone testified that (a) only carpet fibers have "trilobal" shape, and (b) despite "tremendous" variability in carpet fibers, the fibers found on the clothing were "indistinguishable" from the carpet fibers in Mr. Bragdon's living room and <u>unlikely to have any other possible source</u>. Both pieces of testimony supported the conclusion that the fibers from the complainant's clothing must have come from Mr. Bragdon's carpet. Both pieces of testimony were also demonstrably false.

As to Special Agent Malone's testimony that only carpet fibers are "trilobal" in composition, Mr. Robertson's independent report found this statement to be deceitful: "Fibers having a trilobal shape can be found in a variety of items besides carpet." (Ex. D, at 4). As to the "indistinguishable" characteristics found between the samples here and the "tremendous" variability of carpet fibers and the lack of any other possible source, Mr. Robertson's report found this testimony equally untrue: "As carpet is mass produced, to state that other carpet with the same characteristics as the suspect's carpet may not exist is erroneous and implausible." *Id.*

In fact, Mr. Robertson's report found that Special Agent Malone did not even perform the proper testing to make the kinds of conclusions he was drawing. For instance, while

Special Agent Malone spoke of his comparisons of the trilobal shapes of the two fibers, it does

not appear that he even conducted the relevant microscopic tests to make this comparison.

According to the independent report, "[o]ne cannot always determine if two fibers have the same

cross-sectional shape from a longitudinal view as was performed in this case." (Ex. D, at 3).

Indeed, despite Special Agent Malone's testimony, there was no documentation that cross-

sections were even made and compared in this case.[5]

Perhaps most troubling were Special Agent Malone's notes that indicated that

"beige trilobal nylon" fibers were recovered from the victim's pants, panties, bra, and socks that

*did not match* Mr. Bragdon's carpet. The existence of these beige fibers was not contained in the

laboratory report, and suggests that Special Agent Malone withheld this evidence from the

defendant, the jury, and the Court.

---

[5]    Mr. Robertson's report cited similar problems regarding proper documentation of
evidence and results. He considered Special Agent Malone's documentation in the case file to be
"marginal," and commented that Special Agent Malone's notes were not dated or initialed, and
included shorthand ("ftfvtc") that had no meaning. (Ex. D, at 4). Similarly, Special Agent
Malone incorrectly testified that the microspectrophotometer he allegedly used can tell if fibers
have the same dye. According to the Independent Examiner's report, the
microspectrophotometer is used to measure and compare color; it cannot identify a dye. *See* Ex.
D, at 5, *citing* JOURNAL OF FORENSIC SCIENCES, Nov. 1988, at 1332-1344, and Mar. 1990, at
301-315.

Thus, Mr. Robertson's report reached the following conclusions:

Review of Laboratory Reports(s) and Bench Notes:

1)    Did the examiner perform the appropriate tests in a scientifically acceptable manner, based on the methods, protocols, and analytic techniques available at the time of the original examination(s)? . . . ___Yes   _x_ No   ___ Unable to determine

2)    Are the examination results set forth in the laboratory report(s) supported and adequately documented in the bench notes? . . . ___Yes   _x_ No   ___ Unable to determine

* * * *

3)    Testimony consistent with laboratory report(s)? . . . ___Yes   _x_ No   ___ Unable to determine

4)    Testimony consistent with bench notes? . . . ___Yes   _x_ No   ___ Unable to determine

5)    Testimony within bounds of examiners expertise? . . . ___Yes   _x_ No   ___ Unable to determine

Ex. D. at 2.

## CLAIMS FOR RELIEF AND ARGUMENTS

I.    <u>Special Agent Malone's Perjury Violated Mr. Bragdon's Due Process Rights.</u>

D.C. Code § 23-110(a) provides that "a prisoner in custody under sentence of the Superior Court claiming the right to be released upon the ground that . . . the sentence was imposed in violation of the Constitution of the United States or the laws of the District of Columbia . . . may move the court to vacate, set aside, or correct the sentence." Because Mr. Bragdon's Fifth Amendment due process rights were violated when Special Agent Malone knowingly presented perjurious testimony, Mr. Bragdon is entitled to relief under § 23-110.

A.    <u>Special Agent Malone Committed Perjury.</u>

Under D.C. Code § 22-2402(a)(1), a person commits perjury if: "[h]aving taken an oath of or affirmation before a competent tribunal . . . that he or she will testify . . . truly, . . .

14

willfully and contrary to an oath . . . states . . . any material matter which he or she does not believe to be true and which in fact is not true." The elements of perjury are therefore: "(1) an oath, (2) before a competent person or tribunal; (3) a statement of false, (4) material facts; and (5) knowledge of the falsity." *Hsu v. United States*, 392 A.2d 972, 978 (D.C. 1978). As an initial matter, there is no dispute that Special Agent Malone's testimony satisfies the first three elements of § 22-2402(a)(1): he testified under oath before a competent tribunal and gave false testimony. As demonstrated below, the latter two elements of materiality and knowing falsity are likewise easily met.

*__Materiality__*. Special Agent Malone's testimony certainly satisfies the minimal level of materiality necessary under the perjury statute. His testimony about the central physical evidence in the case "ha[d] a natural tendency to influence, or [was] capable of influencing, the decision of the decisionmaking body to which it was addressed." *United States v. Wells*, 519 U.S. 482, 489 (1997) (defining materiality in the context of 18 U.S.C. § 1014, which prohibits making a false statement to a federally insured bank). Special Agent Malone's testimony was a critical part of the Government's case and was "designed to substantially affect the outcome of the case." *See United States v. Dunnigan*, 507 U.S. 87, 95 (1993).

*__Knowing Falsity__*. Special Agent Malone's pattern of false testimony in other criminal cases, as evidenced in the OIG's report, fully supports the conclusion that Special Agent Malone *knowingly* testified falsely in this case. Even apart from this demonstrated pattern of deception in other cases, the repeated false statements by Special Agent Malone in this case related to the very topic of his alleged expertise -- forensic fiber analysis. As a 17-year veteran of the FBI's hair and fibers unit, with "intensive training" in the area of hair and fiber analysis and bachelor of science and master of science degrees in biology (Tr. 235-236), Special Agent

Malone's false testimony could not have been a "result of confusion, mistake, or faulty memory." *Dunnigan*, 507 U.S. at 94. The following graphic depiction of Special Agent's Malone's false testimony compared with the findings of the independent examiner provides unmistakable confirmation that Special Agent Malone *knowingly* lied at Mr. Bragdon's trial:

| Special Agent Malone's Trial Testimony | Independent Examiner's Findings |
|---|---|
| "Trilobel [sic] refers to the cross sectional shape of the fiber. . . . This shape is very significant, because this is the shape . . . in which carpet fibers are made. *No other type of fiber I know, except carpet fibers, are made in this trilobel [sic] shape.*" (Tr. 245) (emphasis added). | "Fibers having a trilobal shape can be found in a variety of items besides carpet." (Ex. D, at 4). |
| "They [the fibers found on Ms. Farmer] either came from that sample [from Mr. Bragdon's rug] . . . [or] to have come from any other source, [it] would have to be another carpet sample with exactly the same microscopic characteristics, exactly the same composition, exactly the same color and exactly the same dye . . . *if that source even existed,* it would also have had to have been in contact with the clothing of Corronda Farmer." (Tr. 247) (emphasis added). | "As carpet is mass produced, to state that other carpet with the same characteristics as the suspect's carpet may not exist is erroneous and implausible." (Ex. D, at 4). |
| "[T]his trilobel [sic] shape can vary tremendously with the width of the lobe lengths, actually shape itself. . . . There was absolutely . . . [no variation between the fibers from Mr. Bragdon's apartment and the fibers found on Ms. Farmer]. . . . They were basically indistinguishable in all their characteristics." (Tr. 245). | "[T]here is no documentation that cross-sections were made from the fibers. One cannot always determine if two fibers have the same cross-sectional shape from a longitudinal view as was performed in this case." (Ex. D, at 3). |
| [Nothing.] | "Malone's notes indicate 'beige trilobal nylon' fibers were recovered from the victim's pants, panties, bra, socks and the paper bag which *do not match the suspect's beige carpet.* The presence of these beige fibers is not in the laboratory report." (Ex. D, at 4) (emphasis added). |
| "I . . . analyzed the dye in the carpet fibers that's going to give you the color. This is done on a machine, called a microspectrometer. [A]ctually it's the most sensitive test we can do with the fibers. It gives you what is called an absorption curve to the dye. It's kind of a spectral fingerprint of the dye. . . [it] told me they [the fibers] had the same dye." (Tr. 246). | "The microspectrophotometer is used to measure and compare color, it cannot identify a dye." (Ex. D, at 5). |

17

B.    Special Agent Malone's Perjury Is Attributable to the Government.

In criminal cases, the appropriate aim of the prosecution is "not that it shall win a case, but that justice shall be done." *Strickler v. Greene*, 527 U.S. 263, 281 (1999), *citing Berger v. United States*, 295 U.S. 78, 88 (1935). Recognizing that "our system of justice suffers when any accused is treated unfairly," the Court has held that the government violates due process when it withholds favorable, material evidence from the defense or when it presents false testimony. *See Brady v. Maryland*, 373 U.S. 83, 86-87 (1963). In *Brady*, the Court held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to the guilt or to the punishment, regardless of the good faith or bad faith of the prosecution." *Id.* at 87.[6]

While *Brady* did not specifically address the issue of perjured testimony, it cited a number of earlier cases condemning the knowing use of perjured testimony. *See id.* at 86-87. These cases included *Pyle v. Kansas*, 317 U.S. 213, 215-216 (1942), in which the Court stated that "allegations that . . . imprisonment resulted from perjured testimony, knowingly used by State authorities to obtain . . . [a] conviction . . . sufficiently charge a deprivation of rights guaranteed by the Federal Constitution, and, if proven, would entitle . . . release from . . . custody." In *Mooney v. Holohan*, 294 U.S. 103, 112 (1935) (*per curiam*), the Court compared the act of "depriving a defendant of liberty through a deliberate deception of court and jury by presentation of testimony known to be perjured" with obtaining a conviction through intimidation, stating that both were "inconsistent with the rudimentary demands of justice." This

---

[6]    Since the Court issued *Brady*, it has held that the duty to disclose material evidence favorable to an accused is applicable even when the defendant has not requested the evidence. *United States v. Agurs*, 427 U.S. 97, 107 (1976). Additionally, it has found that the duty to disclose also extends to impeachment evidence, and not just exculpatory evidence. *United States v. Bagley*, 473 U.S. 667, 676 (1985).

rule applies regardless of whether the prosecution solicited testimony it knew to be false or simply allowed false testimony to remain uncorrected. *Napue v. Illinois*, 360 U.S. 264, 270 (1959).

The constitutional obligations imposed by the *Brady* line of cases, including decisions specifically addressing the knowing use of perjured testimony, are not limited to information in the possession of the prosecutor, nor is a constitutional violation measured by either the "moral culpability" or the "willfulness" of the prosecutor. Instead, the Court has specifically held that "the individual prosecutor has a duty to learn of any favorable evidence known to others acting on the government's behalf, including the police." *Kyles v. Whitley*, 514 U.S. 419, 438 (1995). *See also Farley v. United States*, 694 A.2d 887, 890 (D.C. 1997) (recognizing that under *Kyles* "the government is responsible for knowing what the police know"); *Freeman v. Georgia*, 599 F.2d 65, 69 (5th Cir. 1979) (noting that "when an investigating officer willfully and intentionally conceals material information" his conduct is imputed to the state as part of the prosecution team, "regardless of his motivation and the otherwise proper conduct of the state attorney"); *Barbee v. Warden, Maryland Penitentiary*, 331 F.2d 842, 846 (4th Cir. 1964) (stating that "the police are also part of the prosecution," and thus their withholding of material information constitutes a due process violation).

That the Government's trial counsel knew nothing of Special Agent Malone's perjury does not excuse Special Agent Malone's actions or cleanse the Constitutional violation. Courts have long held that knowingly false or misleading testimony by law enforcement officers, as agents of the Government, violates due process. The officer's perjury is directly attributable to the government, and if it is material to the case, requires setting aside the conviction. *See, e.g., Scheider v. Estelle*, 552 F.2d 593, 595 (5th Cir. 1977) (reversing the denial of habeas relief

and ordering a full hearing on the merits where the alleged perjury was by a state law enforcement officer). *See also Curran v. Delaware*, 259 F.2d 707, 713 (3d Cir. 1958) (explaining that perjury by a detective testifying as to a material fact during trial violates due process, causing a trial "to pass the line of tolerable imperfection and fall into the field of fundamental unfairness"); *Wedra v. Thomas*, 671 F.2d 713, 717 n.1 (2d Cir. 1982) ("the knowledge of a police officer may be attributable to the prosecutor if the officer acted as an arm of the prosecution"); *cf. Holleman v. United States*, 721 F.2d 1136, 1141 (7th Cir. 1983) (Swygert, J., dissenting) ("An investigative officer who works closely with a prosecutor in gathering and presenting evidence against a defendant is not in the same position as other prosecution witnesses.").

Even if the prosecutor, after making a good faith effort, fails to uncover material evidence known only by the law enforcement officials, "the prosecution's responsibility for failing to disclose known, favorable evidence rising to a material level of importance is inescapable." *Kyles*, 514 U.S. at 419. In response to an argument that the government should not be accountable under *Brady* for evidence known only to police investigators and not the prosecutors, the Court explained that:

> To accommodate the State in this manner would . . . amount to a serious change of course from the *Brady* line of cases . . . [A]ny argument for excusing a prosecutor from disclosing what he does not happen to know about boils down to a plea to substitute the police for the prosecutor, and even for the courts themselves, as the final arbiters of the government's obligation to ensure fair trials.

*Id.*

In this case, Special Agent Malone's perjury occurred in his official capacity as an FBI examiner testifying as an agent for the Government. His testimony is therefore fully attributable to the Government just as if the prosecution had knowingly offered this false

testimony. It makes no difference that the prosecutor acted ethically and conscientiously; the Court must still treat this case as one in which the United States has knowingly presented perjured testimony to obtain a conviction.

C.    Special Agent Malone's Testimony Was Material to the Outcome of Trial.

Even if the prosecution knowingly (either actually or constructively through one of its agents) withholds favorable evidence or presents perjured testimony, an accused's due process rights are violated only if the evidence in question is material. *See Strickler*, 527 U.S. at 281-282 (explaining that there is "never a real *Brady* violation" unless the nondisclosure is material). Implicit in this materiality standard is the concern of the Court that any suppressed evidence or perjury by a government agent might have affected the outcome of the trial. *See Bagley*, 473 U.S. at 674-675. Therefore, "a constitutional error occurs, and the conviction must be reversed, only if the evidence is material in the sense that its suppression undermines confidence in the outcome of the trial." *Id.* at 678.

Materiality, in the context of determining whether a *Brady* type violation occurred, is not gauged by a sufficiency of the evidence test, and it "does not require demonstration by a preponderance that disclosure . . . would have resulted ultimately in an acquittal." *Kyles*, 514 U.S. at 434-435. Instead, the evidence or testimony is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Bagley*, 473 U.S. at 676. The Court has further explained:

> *Bagley*'s touchstone of materiality is a "reasonable probability" of
> a different result, and the adjective is important. The question is
> not whether the defendant would more likely than not have
> received a different verdict with the evidence, but whether in the
> absence he received a fair trial, understood as a trial resulting in a
> verdict *worthy of confidence*. A "reasonable probability" is

21

accordingly shown when the government's evidentiary suppression "undermines the outcome of the trial."

*Kyles*, 514 U.S. at 434. (emphasis added).

In situations in which the prosecution team (including a government agent testifying as a witness) knowingly used perjured testimony to obtain a conviction, an even stricter standard is applicable. In such cases, the perjured testimony is considered material "unless failure to disclose it would be harmless beyond a reasonable doubt." *Bagley*, 473 U.S. at 680. This standard is far more favorable to defendants than an ordinary "sufficiency of the evidence" type standard "not just because [these cases] involve prosecutorial misconduct, but more importantly because they involve a corruption of the truth-seeking function of the trial process." *Agurs*, 427 U.S. at 103.

Therefore, it makes no difference in this case whether the testimony of Ms. Farmer and the other prosecution witnesses might have been sufficient to convict Mr. Bragdon absent Special Agent Malone's testimony. *See United States v. Smith*, 77 F.3d 511, 512, 316 U.S. App. D.C. 199, 201 (D.C. Cir. 1996). Since Special Agent Malone's false testimony is attributable to prosecution team, his perjured testimony was "knowingly" used by the United States to convict Mr. Bragdon. His conviction thus violates his due process rights unless the admission of the perjured testimony was harmless beyond a reasonable doubt, or that there is no possibility that his testimony "undermined confidence in the outcome of the trial." *See Kyles*, 514 U.S. at 434.

By initiating the independent examination after reviewing the facts of this case, the Government has essentially conceded that Special Agent Malone's testimony against Mr. Bragdon was "material to [his] conviction." (Ex. C.) This concession is fully warranted. As described earlier, the prosecution's case and the key disputed issue consisted of testimony from

22

Ms. Farmer, Dr. Robertson-Hackney, Special Agent Malone, and several other witnesses who testified as to Ms. Farmer's distressed state after the alleged rape. In defense, Mr. Bragdon never disputed that he had offered Ms. Farmer a ride outside of the Dix Academy, that they had gone to his apartment, or that he later dropped her off nearby a bus stop. Instead, he claimed that he never engaged in any act of sexual intercourse, consensual or otherwise. Special Agent Malone's testimony therefore played a key role by providing the only physical evidence in the case to support Ms. Farmer's version of events, and by strongly suggesting that Ms. Farmer came into contact with the rug in Mr. Bragdon's apartment while her underwear was exposed.

The prosecutor in her closing argument to the jury emphasized the important role this fiber evidence played in corroborating Ms. Farmer's testimony. Based on Special Agent Malone's unequivocal testimony that the fibers on Ms. Farmer's clothes were "basically indistinguishable" from Mr. Bragdon's carpet, and that it was highly unlikely that another possible source "even existed," the prosecutor argued:

> The question is how did they get where they were found . . . [I]sn't it the important point that they came from some piece of clothing, some part of her clothing touched the carpet. And how could it? There's no evidence she sat on the floor. She told you she was laid on the floor when he raped her, with only her shirt on . . . top and her bra. Her pants, both pair of pants, underpants and the outerpants, pulled down. *The only way that those fibers could have gotten on any of that clothing, whether it was the underpants, the shirt, the outer pants was if she was laying on the floor.*

(Tr. 367-368) (emphasis added). As it turns out, the underlying assumption of the prosecutor was both false and misleading.

The circumstances of the jury deliberations and apparent compromise verdict demonstrate the crucial part this perjured testimony played. Based on Special Agent Malone's testimony, uncontested at the time but now known to be perjured, the jury was misled into believing the <u>only possible source</u> of the fibers found on Ms. Farmer's clothes was the very

23

carpet in Mr. Bragdon's apartment. If the jurors had known that Special Agent Malone (a) testified falsely as to the absence of other possible sources and the fact that other fibers besides carpet exist in the trilobal form, (b) did not disclose the existence of other, non-matching fibers recovered from Ms. Farmer's clothing, or (c) performed longitudinal testing that was not sufficient to draw the kinds of conclusions about which he testified, there is much more than a "reasonable probability" that the outcome of the trial would have been different. Given the factual dispute that decided the verdict -- whether sexual contact took place on the floor of Mr. Bragdon's apartment -- Special Agent Malone's testimony provided the definitive physical evidence in the case. His perjured testimony implied that Mr. Farmer came into contact with the exact rug in Mr. Bragdon's apartment (and none other) when she was not wearing her pants. This undisputed (but false) testimony very likely led the jury to reach this compromise verdict -- essentially finding that some attempted sexual contact occurred on the floor with pants down, just not penetration.

The divided Court of Appeals decision underscores just how close a case this was on the merits, even setting aside the now-divulged perjured testimony of Special Agent Malone. Unlike the situation where a jury appears to accept the complaining witness's version of events in toto, the rationale of the majority Court of Appeals decision posited a theory in which the jury accepted some -- but not all -- of the complainant's testimony. In such cases where it is clear that the jury refused to accept either side's version of the testimony completely, physical evidence naturally plays a critical role in the ultimate jury determination. While the jury rejected the fundamental nature of Ms. Farmer's testimony, it is quite likely that Special Agent Malone's unequivocal testimony regarding the only possible source of the fibers found on Ms. Farmer's underwear led the jury to believe that *something* must have happened, thus pushing the jury

24

towards its guilty verdict on the lesser included charge. While Judge Mack may well have been right in 1995 when he concluded that such a verdict defied rationality, it is now beyond peradventure that the verdict can no longer stand.

Furthermore, the testimony of the defense's expert fiber witness, Dr. Walter Rowe, does not insulate Special Agent Malone's testimony from attack. Dr. Rowe testified primarily on the issue of the possible transference of fibers from different pieces of Ms. Farmer's clothes. More importantly, although Dr. Rowe stated that he agreed with Special Agent Malone's laboratory conclusion regarding the possible source of the fibers, he was not aware of the false and misleading statements and gross exaggerations in Special Agent Malone's trial testimony.

Since Dr. Rowe was not present in the courtroom during Special Agent Malone's testimony, and neither the prosecutor nor the defense attorney told Dr. Rowe about these statements or asked him to comment on them, he was unable to clarify these misstatements. *See* Affidavit of Dr. Rowe, Ex. A, at ¶¶ 11, 15. Instead, all of Dr. Rowe's statements referring to Special Agent Malone's testimony were made under the false assumption that Special Agent Malone testified consistently with his laboratory report. *See id.* at ¶ 14. In fact, Dr. Rowe noted that "Special Agent Malone did not testify consistently with his laboratory reports in this matter since the report did not include any opinions about the significance of these tests." *See id.* at ¶ 21. Had Dr. Rowe known about the exaggerations and misstatements contained in Special Agent Malone's testimony, he would not have summarily agreed with Agent Malone's conclusions, as he did when questioned on cross-examination. (Tr. 338); *see also* Affidavit of Dr. Rowe at ¶ 22. Indeed, after reviewing Special Agent Malone's testimony in this case, Dr.

Rowe concluded that his testimony collectively overstated the significance of the carpet fiber test analysis. *See* Affidavit of Dr. Rowe at ¶ 21.

These exaggerations and false statements constituted the most damning parts of Agent Malone's testimony, as they strongly suggested the fibers found on the clothing were unlikely to have any other possible source. Not only were these statements false, but they were not addressed by Dr. Rowe during his testimony. To the contrary, Dr. Rowe was unaware of Special Agent Malone's misstatements and conclusions, and would not have agreed to this at the time of trial. *See* Affidavit of Dr. Rowe. Indeed, Dr. Rowe's testimony that he agreed with Special Agent Malone's conclusions (based solely on his laboratory report) likely exacerbated the effect of Special Agent Malone's exaggerations and misstatements by giving these statements greater credibility. As a result, Dr. Rowe's unwitting agreement with Special Agent Malone's false testimony only compounded the constitutional error. In these circumstances, the Government cannot now preserve this conviction by bootstrapping on Professor Rowe's testimony.

Mr. Bragdon did not receive a fair trial because a critical piece of the Government's evidence consisted of perjured testimony by a Government agent. This perjured testimony, and in particular the comments Special Agent Malone made ignoring the fact that there exist other possible sources of carpet, was indisputably material to Mr. Bragdon's conviction, and certainly indicates much more than a "reasonable probability" that the outcome would have been different absent the perjury. While it is impossible to know for sure whether this false testimony provided the final impetus for the jury's verdict, Special Agent Malone's perjurious testimony certainly "undermine[d] the outcome of the trial" and cannot be said to have resulted in a "verdict worthy of confidence." *See Kyles*, 514 U.S. at 434.

26

II.    Alternatively, the Court Should Grant Relief Under a Writ of *Coram Nobis*

Mr. Bragdon has demonstrated that relief is appropriate under D.C. Code

§ 23-110, which allows "motions for relief [to be] made at any time." If this Court determines,

however, that relief is for some reason unavailable under § 23-110, Mr. Bragdon requests that the

Court grant him relief by issuing a writ of error *coram nobis*.

*Coram nobis* is available in extraordinary circumstances where action is needed

"to achieve justice." *United States v. Morgan*, 346 U.S. 502, 511 (1954). The District of

Columbia Court of Appeals has explained that:

> [T]he writ of *coram nobis* requires that (1) the trial court be
> unaware of the facts giving rise to the petition; (2) the omitted
> information is such that it would have prevented the sentence or
> judgment; (3) petitioner be able to justify the failure to provide the
> information; (4) the error be extrinsic to the record; and (5) the
> error be of the most fundamental character."

*United States v. Hamid*, 531 A.2d 628, 634 (D.C. 1987). If the Court determines that relief under

§ 23-110 is foreclosed for some reason, then this case would represent the precise circumstances

for which this remedy is available -- to correct the due process violation that occurred during Mr.

Bragdon's trial when Special Agent Malone committed perjury.

Each of the requirements outlined in *Hamid* is met here. First, it is certain that the

trial court was unaware of Special Agent Malone's perjury during the trial. Second, for the

reasons discussed above, the omitted information -- Special Agent Malone's perjury -- would

have prevented the conviction and sentence. *See Hamid*, 531 A.2d at 639-640. Third, Mr.

Bragdon had no knowledge of this perjury until informed by the Government ten years later, and

thus could not have provided this information sooner. Fourth, the error is extrinsic from the

record, and only came to light after the independent reexamination of Special Agent Malone's

laboratory work and testimony. Finally, as discussed previously, perjury by a government agent

results in "a corruption of the truth-seeking function of the trial process," resulting in a proceeding that can be nothing but "fundamentally unfair." *See Agurs*, 427 U.S. at 103.

## REQUEST FOR EVIDENTIARY HEARING

Mr. Bragdon respectfully submits that the foregoing information provides an adequate basis for this Court to grant the requested relief. However, if the Court deems the current record to be insufficient to grant relief at this stage, the Petitioner respectfully requests a full evidentiary hearing to develop the record further. At such an evidentiary hearing, Mr. Bragdon would avail himself of the subpoena power to compel witnesses and documents that can illuminate the full extent and impact of Special Agent Malone's perjury. Before such hearing, Mr. Bragdon would seek to discover pertinent facts from the United States and Special Agent Malone.

## CONCLUSION

Mr. Bragdon has been incarcerated for the past ten years in no small part because of the perjured testimony by an FBI Special Agent -- testimony that supplied the key physical evidence leading to his conviction. It is difficult to imagine a more compelling case for relief under § 23-110. Mr. Bragdon respectfully requests that this Court set aside or vacate his conviction and sentence.

Respectfully submitted,

Michael X. Imbroscio
D.C. Bar. No. 445474
COVINGTON & BURLING
1201 Pennsylvania Ave., NW
Washington, DC 20004
(202) 662-6000

*Counsel for Petitioner Anthony Bragdon*

March 27, 2002