EXHIBIT 2

SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
CRIMINAL DIVISION - FELONY BRANCH

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | CASE NO. F-4131-91 |
| | ) | |
| v. | ) | JUDGE DUNCAN-PETERS |
| | ) | |
| ANTHONY E. BRAGDON | ) | CLOSED CASE |

FILED
IN OPEN COURT
MAR 1 4 2003
Superior Court
of the District of Columbia
Washington, D.C.

**ORDER GRANTING DEFENDANT'S PETITION
TO SET ASIDE, VACATE, AND/OR CORRECT CONVICTION AND
SENTENCE AS TO THE CONVICTIONS FOR ASSAULT WITH INTENT
TO RAPE WHILE ARMED (COUNT L) AND POSSESSION OF A
FIREARM DURING A CRIME OF VIOLENCE (COUNT H)**

This matter comes before the Court upon consideration of the Defendant's Petition to Set Aside, Vacate, and/or Correct Conviction and Sentence, or in the Alternative, for a Writ of *Coram Nobis*. The United States has filed an Opposition to the Petition and the Defendant has filed a Reply. In support of its Opposition, the United States also filed a Supplemental Affidavit of Assistant United States Attorney Patricia Stewart. The United States also filed a supplemental, typed transcription of the Defendant's statement. On January 2, 2003, the Court held a hearing on the Petition and both sides presented argument.

**INTRODUCTION**

On March 10, 1992, a jury convicted the Defendant of assault with intent to rape while armed, and possession of a firearm during a crime of violence. As explained in detail on page 3, *infra*, the same jury acquitted him of five other counts. Ten years after the conviction, the government learned that some of the trial testimony of its hair and fiber expert witness, former Federal Bureau of Investigation Special Agent Michael S. Malone, was either false or not supported by Mr. Malone's notes, and that Mr. Malone did not disclose potential exculpatory facts regarding the fiber evidence either to the prosecution or the defense. The United States promptly disclosed this information to the defense, and this petition was filed.

In the petition, based on the recent FBI re-examination of Mr. Malone's trial testimony, expert report, and notes, the Defendant challenges the jury's verdict and the Court's sentence. The Defendant contends that Mr. Malone's testimony about the fibers found on the complaining witness' clothing matching the carpet in Defendant's apartment was both material and false and likely made the difference between acquittal and conviction. The Defendant asserts that Mr. Malone's testimony was materially false in three ways. First, that he "testified falsely as to the absence of other possible sources and the fact that other fibers besides carpet exist in the trilobal form." Second, that he "did not disclose the existence of other, non-matching fibers recovered from Ms. Farmer's clothing." Third, that he "performed longitudinal testing that was not sufficient to draw the kinds of conclusions about which he testified." See Defendant's Petition at 24.

The independent investigation revealed that a variety of items, other than carpets, contain fibers in the trilobal form. This revelation directly conflicts with Mr. Malone's statements that the carpet fibers he examined would have to come from the Defendant's carpet or another carpet sample with the same exact microscopic characteristics, if such a source even existed. Mr. Malone testified that "they were basically indistinguishable in all their characteristics." (Tr. 245). The independent report also stated that "a carpet is mass produced, to state that other carpet with the same characteristics as the suspect's carpet may not exist is erroneous and implausible."

Mr. Malone's notes indicated that he found other similarly colored, trilobal fibers from the victim's clothing that did not match the Defendant's carpet. These notes did not find their way into his lab report or his testimony. Furthermore, the independent report found that Mr.

2

Malone's laboratory comparisons of the fibers did not include the relevant microscopic tests needed to truly match the shapes of the fibers. Mr. Malone did not make the necessary cross-sectional observations or dye testing needed to truly match the fibers.

**BACKGROUND**

### I. PROCEDURAL HISTORY

#### A. THE PRE-TRIAL AND TRIAL PROCEEDINGS

In a ten-count indictment filed on May 22, 1991, the grand jury charged Defendant with assault with a deadly or dangerous weapon, kidnapping while armed, rape while armed, sodomy, assault with intent to commit sodomy while armed, armed robbery, possession of a firearm during a crime of violence, first-degree theft, unauthorized use of a motor vehicle (UUV), and receiving stolen property (RSP), in violation of D.C. Code §§ 22-502; 22-2101; 22-3202; 22-2801; 22-3502; 22-503; 22-2901; 22-3204(b); 22-3811; 22-3812(a); 22-3815; 22-3832(a); and 22-3832(c)(1). (All statutory references are to the 1981 edition of the D.C. Code. D.C. Code § 22-2801 was repealed by the "Anti-Sexual Abuse Act of 1994," which became effective on May 23, 1995. D.C. Code § 22-3502 also was repealed by the "Anti-Sexual Abuse Act of 1994.") On September 19, 1991, the first-degree theft, UUV, and RSP counts were severed for trial. Trial on the remaining seven counts began on March 3, 1992, before the Honorable Harriett R. Taylor.[1]

On March 10, 1992, the jury, after becoming deadlocked and receiving a <u>Winters</u> charge, convicted Defendant of one count of assault with intent to rape while armed (the lesser-included offense of rape while armed) and one count of possession of a firearm during a crime of violence. The jury acquitted Defendant of the remaining five counts.

3

### B.   THE SENTENCE

On April 30, 1992, Judge Taylor sentenced Defendant under the Youth Rehabilitation Act, D.C. Code § 24-803(b), to up to 15 years on each of the two counts, and found that the mandatory-minimum sentence did not apply. There was no indication from the court as to whether the sentences were to be served concurrently or consecutively. This issue was addressed in the Defendant's second appeal, and the Court of Appeals found that the sentences were consecutive. Bragdon v. United States, 717 A.2d 878, 881 (D.C. 1998).

### C.   THE SEVERED COUNTS

On September 23, 1992, Defendant pled guilty to attempted UUV (the lesser-included offense of UUV), and the government dismissed the first-degree theft count and the RSP count. Pursuant to Section 803(b) of the Youth Rehabilitation Act, the Honorable Patricia Wynn sentenced Defendant to a sentence not to exceed six months.

### D.   THE FIRST APPEAL

On May 28, 1992, Defendant noticed his direct appeal, primarily arguing that the trial court erred in admitting into evidence a videotaped identification and in instructing the jury on the lesser included offense of assault with intent to commit rape while armed. On November 30, 1995, the Court of Appeals affirmed Defendant's convictions. Bragdon v. United States, 668 A.2d 403 (D.C. 1995).

On January 31, 1996, Defendant filed a petition for Rehearing, or in the Alternative, for Rehearing *En Banc*. On September 20, 1996, the Court of Appeals denied Defendant's petition for rehearing *en banc*. The mandate issued on September 30, 1996.

---

This Court has inherited all of Judge Taylor's post-conviction matters.

### E.  THE FIRST MOTION FOR POST-CONVICTION RELIEF

On January 27, 1997, Defendant filed his first Motion for Correction and Reduction of Sentence pursuant to Super. Ct. Crim. R. 35, alleging that his sentence was not intended to be consecutive under the Youth Rehabilitation Act. On February 11, 1997, the Honorable Henry H. Kennedy, Jr., denied Defendant's motion.[2]

### F.  THE SECOND APPEAL

On March 11, 1997, the Defendant noted an appeal from the denial of the motion. On September 10, 1998, the Court of Appeals affirmed the trial court's denial of the Defendant's motion. Bragdon v. United States, 717 A.2d 878 (D.C. 1998).

### G.  THE SECOND MOTION FOR POST-CONVICTION RELIEF

In April 1997, the United States Department of Justice, Office of the Inspector General, issued a Special Report titled, "The FBI Laboratory: An Investigation Into Laboratory Practices and Alleged Misconduct in Explosives-Related and Other Cases." In the report, Mr. Malone was identified as a person who had falsified work. Although Mr. Bragdon's case was not mentioned in the Special Report, Steve Robertson, an independent scientist, conducted a subsequent analysis of Mr. Malone's work and a report was prepared.

On August 13, 2001, the government forwarded the report to counsel for Defendant. On March 27, 2002, Defendant filed his Petition to Set Aside, Vacate, and/or Correct Conviction and Sentence, or in the Alternative, for a Writ of Coram Nobis.

---

[2] At that time, Judge Kennedy was handling all of Judge Taylor's post-conviction matters.

5

## II. THE TRIAL

### A. THE GOVERNMENT'S EVIDENCE

The bulk of the Government's case was based upon the testimony of Corronada Farmer, the complaining witness. Ms. Farmer testified that on April 9, 1991, at approximately 12:30 p.m., she walked out of the Dix Street Academy in the 1400 block of Brentwood Avenue, NE, Washington, D.C., and headed to the bus stop (Tr. 29, 31-32). ("Tr." refers to the transcript of the trial proceedings before the Honorable Harriett R. Taylor.) As she was walking, Mr. Bragdon pulled up in a red and gold Toyota truck, engaged her in conversation, and asked whether she wanted a ride (Tr. 33, 34A). Ms. Farmer rejected his offer (Tr. 34A). Suddenly, Mr. Bragdon ordered Ms. Farmer to get in the truck. When she refused, he pulled out what was later determined to be a starter pistol, fired it once, and told Ms. Farmer to get in the truck or she would die (Tr. 34). Other than Ms. Farmer, the Government did not provide any witnesses to this interaction or the gunfire. Ms. Farmer got into the truck. Once she was in the truck, she saw the gun that Mr. Bragdon had placed between the seats (Tr. 35).

Mr. Bragdon drove Ms. Farmer to his apartment at 847 19th Street, NE, and ordered her at gunpoint to go into the apartment (Tr. 46, 133). She entered the apartment and sat down at the kitchen table while he walked into the front room (Tr. 47-48). She could still see him from the kitchen and he could observe her from the front room (Tr. 48).

Eventually, at Mr. Bragdon's direction, Ms. Farmer moved to the living room where Mr. Bragdon sat down on the sofa next to her (Tr. 51). According to Ms. Farmer, after they had talked for several minutes, Mr. Bragdon retrieved the "blank" gun from the closet, forced her to remove her pants and underwear, and raped her (Tr. 53-59). The rape took place on the carpeted

6

floor of the apartment. Ms. Farmer testified that she and Mr. Bragdon then left the apartment and that he took $10 from her (Tr. 31, 60). Mr. Bragdon drove her to a nearby location from where she could walk to a bus stop and take a bus home (Tr. 65-66). He dropped her off at that location.

Once she got home, Ms. Farmer called her friend Patricia Winston to tell her about the rape (Tr. 66). Ms. Patricia Winston called her mother, Sandra Winston, who in turn called Ms. Farmer to ask her what had transpired (Tr. 102). When Ms. Sandra Winston called Ms. Farmer, she was crying and upset and said she had been raped (Tr. 101-103, 106). Ms. Sandra Winston called the police (Tr. 106).

Ms. Farmer was taken to D.C. General Hospital where Dr. Yolanda Robertson-Hackney examined her (Tr. 151, 154). Dr. Robertson-Hackney did not observe any cuts, tears, bruising, or other evidence of sexual penetration (Tr. 155-156). On the PD-214, Dr. Robertson-Hackney checked the boxes indicating that the results of her examination were inconsistent with vaginal, labial, or anal penetration of Ms. Farmer (Tr. 157). The doctor explained to the jury that her findings were actually inconclusive because she could not tell whether there had been penetration but she admitted that she checked the "no" boxes rather than the "unknown" boxes on the police form (Tr. 157-158, 173-177). Dr. Robertson-Hackney added that because Ms. Farmer had been menstruating at the time, if someone had penetrated her several times while she was on the floor, one would expect to find blood on the floor (Tr. 171). Dr. Robertson-Hackney also testified that if there had been no penetration of Ms. Farmer, she had not been raped (Tr. 183). The jury was shown the videotape of Ms. Farmer's identification of Defendant at his April

17, 1991 lineup (Tr. 277, 280) and the government introduced evidence that the gun was found in a closed in the Defendant's apartment (Tr. 134-136).

### B. THE DEFENSE CASE

The Defendant's theory of the case was that the government had not proven the elements of each offense beyond a reasonable doubt (Tr. 426). The defense did not dispute that Ms. Farmer went to Mr. Bragdon's apartment, but did dispute that any sexual activity took place. The Defendant called Ron Goldman, an investigator, who testified as to the distance from the school to Defendant's apartment (Tr. 306). The Defendant also called Robert Grispino, a forensic serology expert with the FBI, who concluded that there was no blood on the recovered carpet fibers or semen on any of Ms. Farmer's clothing (Tr. 316). Professor Walter Rowe, Defendant's carpet fiber expert, testified, in part, that the fibers recovered from Ms. Farmer's clothing may have been transferred from one item of clothing to another because of the way Ms. Farmer's clothing had been placed together in a paper bag (Tr. 332-336).

## ANALYSIS

### I. LEGAL STANDARDS

The Defendant bases his Petition on both Mr. Malone's false testimony as well as Mr. Malone's nondisclosure of relevant testimony. Each variety of misconduct carries its own legal standard(s) to consider. Mr. Malone's mischaracterization, along with the independent investigator's findings, could be considered both new evidence and false testimony. The standard of review differs for both. To allow for a new trial, the Court need only find that the analytical test for either type of misconduct is satisfied. Furthermore, the Court may grant a new

trial if the nondisclosure of relevant evidence has occurred under Brady v. Maryland, 373 U.S. 83 (1963).

First, the revelation that Mr. Malone testified falsely represents new evidence in the case.

> In order to be entitled to a new trial based on newly discovered evidence, the defendant must show that (1) the evidence proffered is newly discovered; (2) the moving party must show diligence in his efforts to obtain the new evidence; (3) the evidence must not be merely cumulative or impeaching; (4) it must be material to the issues involved; and (5) it must be of such a nature that an acquittal would likely result from its use.

See Arrington v. United States, 804 A.2d 1068, 1076 (D.C. 2002). Rather than analyze the impact the missing or inaccurate evidence had on the first trial, the Court must look ahead to determine whether the evidence would effect the outcome of a new trial. See Whitley v. United States, 783 A.2d 629, 634 (D.C. 2001).

Second, false testimony, simply by nature of its lack of truthfulness, will require "a new trial if there is any reasonable likelihood that false testimony could have affected the judgment of the jury." See Leftridge v. United States, 780 A.2d 266, 274 (D.C. 2001). Furthermore, if the false presentations rise to the level of perjury, they are material unless failure to disclose the wrongdoing is harmless beyond a reasonable doubt. See United States v. Bagley, 473 U.S. 667, 680 (1985). In this case, the government has not conceded perjury but it is uncontested that the testimony was false.

Third, nondisclosure of significant, existing evidence can result in a new trial if it meets the criteria set forth in Brady v. Maryland, supra. "The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the [government], either willfully or inadvertently; and prejudice must

9

have ensued." See Black v. United States, 755 A.2d 1005, 1010 (D.C. 2000) (explaining Brady.). There must be "a reasonable probability that the result of the trial would have been different if the suppressed [evidence] had been disclosed to the defense." See Strickler v. Greene, 527 U.S. 263, 280 (1999).

## II. ANALYSIS

Under the second standard (false testimony) and the third standard (nondisclosure), the Defendant is entitled to a new trial. If the revelations about Mr. Malone's dishonesty are to be considered new evidence, the five-part test is more difficult to satisfy. There is no dispute that the independent review of Mr. Malone's testimony constitutes new evidence. The discovery of his wrongdoing was beyond the control of the Defendant and the information was promptly provided to the Defendant. The carpet fiber evidence is the only physical evidence that supports the conclusion that Ms. Farmer was in the Defendant's apartment and that her clothes were in contact with the carpet.[3] That evidence is not merely cumulative and is not impeachment. As to materiality, in this analysis the Court must look forward to a new trial with the new evidence presented. In a new trial, the Government would be forced either to not put on any carpet evidence, or have an expert accurately testify about the carpet fibers. Without the testimony at all, only Ms. Farmer's account places her on the floor in the Defendant's apartment, supporting

---

[3] The Defendant made an oral statement to the police indicating that Ms. Farmer voluntarily went with him to his apartment. That statement was transcribed and included in the government's March 14, 2003 filing. It was not introduced into evidence at the first trial. Assuming that the government elected to introduce it into evidence in any retrial, the Defendant denies that he engaged in any sexual activity with Ms. Farmer. His statement does not establish that she was lying down on the floor of his apartment or the carpet. Therefore, his statement, even if admitted into evidence at a retrial, would not establish the requisite elements of the government's case or serve to replace the corroboration provided by the false fiber evidence. Additionally, the statement includes information that potentially would help the defendant, including his claim that Ms. Farmer saw the starter pistol in his closet. Thus, this statement is a double-edged sword for the government.

10

the assault with intent to rape conviction. Given the added weight juries may give physical evidence and a jury's providence to either believe or disbelieve a lay witness, it is possible, if not probable that a new trial would result in a different verdict. See Greer v. U.S., 697 A.2d 1207, 1210 (D.C. 1997) (stating that lack of physical evidence is a fact properly presented to the jury in closing argument.). The standard, however, also requires that given the new evidence an acquittal be likely. While the Court is convinced that it would be reasonable to expect a different outcome, the Court cannot say that an acquittal would be likely.

If Mr. Malone's testimony, as it should be, is considered false evidence under Leftridge and Bagley, the analysis better supports allowing a new trial. The standard requires only "any reasonable" likelihood that the jury's judgment was affected. The jury underwent a lengthy and obviously difficult deliberation and returned a guilty verdict only on the firearm charge and the lesser-included, intent-based charge of attempted rape. The jurors began deliberating in the morning of March 9, 1992. By the afternoon, they had reached a decision of not guilty on two of the counts, but were sharply divided on the others. (Tr. of March 9, 1992 at 2.) Late in the afternoon, they presented the Court a note declaring that they were deadlocked. (Tr. of March 9, 1992 at 6.) They were given a Winters charge (Tr. of March 9, 1992 at 7) and finally reached a verdict on all counts late in the morning the next day. (Tr. of March 10, 1992 at 2.) Given the length of time the jury spent deliberating, the initial inability to reach a verdict, the acquittal on most of the charges, it is reasonably likely that the jurors relied upon the erroneous evidence and that it affected their judgment. Indeed, they may well have come to a different conclusion without it. Under the same reasoning, following the Brady line of cases, there is a reasonable probability that the result of the trial would have differed.

11

The jury also returned a guilty verdict for carrying a firearm during a crime of violence. The Court instructed the jury that in order to find the Defendant guilty on that charge, the jury would have to find that he committed a crime of violence. The Court listed the possible crimes of violence as assault with a dangerous weapon, kidnapping while armed, rape while armed, assault with intent to commit sodomy while armed, rectal sodomy or armed robbery. The jury acquitted the Defendant on all charges except intent to rape while armed, the lesser-included charge of rape while armed. Therefore, the only crime of violence the jury logically could have based the firearm verdict on is the charge of intent to rape while armed. As the verdict for the underlying crime cannot be upheld, neither can the verdict for carrying a firearm during a crime of violence.

The prosecution based more than a significant part of its case on the important role the carpet fiber evidence played in corroborating Ms. Farmer's testimony. In her closing argument, the Assistant United States Attorney highlighted Mr. Malone's testimony that the fibers on Ms. Farmer's clothes came, in all likelihood, from Mr. Bragdon's carpet and that it was not in dispute where they came from. (Tr. at 367). She also argued that the carpet fiber evidence proved that Ms. Farmer was lying on the carpeted floor in the Defendant's apartment (Tr. at 367-368, 392-393).

The circumstances of the jury deliberations and apparent compromise verdict demonstrate the crucial part this testimony played. The jury plausibly could have believed that the only possible source of the fibers found on Ms. Farmer's clothes was the carpet in Mr. Bragdon's apartment. If the jurors had known that: (1) Mr. Malone testified falsely as to the absence of other possible sources and that other fibers besides carpet exist in the trilobal form,

and, (2) that he did not disclose the existence of other, non-matching fibers recovered from Ms. Farmer's clothing, or, (3) that he performed longitudinal testing that was not sufficient to draw the kinds of conclusions about which he testified, the outcome of the trial reasonably could have been different.

The government contends that because the Defendant's own trial expert did not challenge the findings of Mr. Malone, that Mr. Malone's testimony could not have been material to the outcome of the trial. The Defendant's expert did testify that he found three fibers taken from Ms. Farmer's clothing that matched the carpet samples taken from the Defendant's apartment. However, the Defendant's expert was not in the courtroom when Mr. Malone testified and he only relied upon the lab report in forming his testimony. He had no opportunity to hear or point out the inconsistencies of Mr. Malone's trial testimony. Furthermore, if Mr. Malone's testimony were eliminated, the defense would have no reason at all to provide its own carpet fiber expert.

The government further argues that Mr. Malone's false testimony and withheld information should not be imputed to the prosecution, because the government had no prior knowledge of the wrongdoing. In support of this argument, the Government cites a handful of cases that hold that a police officer's false testimony is not imputable to the prosecution. However, "any argument for excusing a prosecutor from disclosing what he does not happen to know about boils down to a plea to substitute the police for the prosecutor, and even for the courts themselves, as the final arbiters of the government's obligation to ensure fair trials." See Kyles v. Whitley, 514 U.S. 419, 438 (1995). "Even when the prosecution may not know about certain evidence, the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police." See Farely v.

United States, 694 A.2d 887, 889 (D.C. 1997) (quoting Kyles). The government found it necessary to conduct an independent investigation of Mr. Malone and his testimony in various cases. Obviously Mr. Malone's testimony in the present case was significant enough to cast doubt on the outcome of the trial. The Government should not be able to escape the gravity of such a situation by asserting lack of knowledge.

The Court concludes that in this case, false testimony was presented to the jury. The Court concludes that there is a reasonable likelihood that this false testimony affected their verdict. Under these circumstances, the Defendant is entitled to a new trial.

For the foregoing reasons, it is this _14th_ day of March 2003,

**ORDERED** that Defendant's Petition To Set Aside, Vacate, And/Or Correct Conviction And Sentence is **GRANTED** as to the convictions for assault with intent to rape while armed (count L) and possession of a firearm during a crime of violence (count H), for the reasons stated herein. The Court finds no reason to address the petition for a writ of *coram nobis* as it has vacated the convictions and allowed for a new trial for the reasons stated herein.

Stephanie Duncan-Peters
Associate Judge
Signed in Chambers

Copies to:

Michael X. Imbroscio, Esq.
Covington & Burling
1201 Pennsylvania Ave., NW
Washington, DC 20004

T. Anthony Quinn, Esq.
Assistant United States Attorney
555 Fourth Street, NW
Special Proceedings Section, Room 11-907
Washington, DC 20530