**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| ANTHONY BRAGDON, | ) | CASE NO. 06-0258 (JR) |
| | ) | |
| Plaintiff, | ) | JUDGE JAMES ROBERTSON |
| | ) | |
| vs. | ) | |
| | ) | |
| | ) | |
| THE UNITED STATES OF AMERICA, | ) | **PLAINTIFF'S MEMORANDUM IN** |
| | ) | **OPPOSITION TO DEFENDANT'S** |
| Defendant. | ) | **SUPPLEMENT MEMORANDUM** |
| | ) | **IN SUPPORT OF ITS MOTION** |
| | ) | **TO DISMISS** |

**I.    INTRODUCTION**

In making opposition to Defendant's Supplement Memorandum in Support of its Motion to Dismiss, Plaintiff hereby incorporates and reiterates the facts, claims, statements and arguments previously set forth in his First Amended Complaint and in the briefs and pleadings filed heretofore.  Background information here is restated to the extent that it will help clarify the claims raised in Defendant's Supplement Memorandum and Plaintiff's defenses thereto.

Plaintiff Anthony Bragon was convicted in 1992 based upon an investigation performed and evidence supplied by the United States of America through the Federal Bureau of Investigation ("FBI").  It is indisputable that the underlying investigation of the case, and the evidence supplied by the FBI (which was reviewed and tested by analysts at the FBI's laboratory), were inherently flawed and ultimately resulted in Plaintiff's unjust and wrongful conviction.   As a result of the actions, inactions and negligence of employees of the United States and the resulting conviction, Bragdon served many years in prison and suffered great injury.

In 1997, at the conclusion of an investigation by the Office of the Inspector General, the United States issued a special report titled, "The FBI Laboratory: An Investigation into Laboratory Practices and Alleged Misconduct in Explosives-Related and Other Cases" which disclosed numerous problems at the FBI Laboratory[1]; problems with Agent Michael Malone (the FBI agent responsible for the lab analysis in Plaintiff's case) falsifying investigative work; and problems with the lab report in Plaintiff's case.  In March 2002, after receiving the aforesaid information, Plaintiff's attorneys sought to vacate his conviction.

A year later, on March 14, 2003, the Superior Court for the District of Columbia issued an Order which vacated Plaintiff's conviction and confirmed for the first time, that Bragdon had in fact been injured by the [action and/or inaction] of United States.  The United States did not seek to re-try Plaintiff.

In seeking the dismissal of Plaintiff's Negligence claims in its Supplement Memorandum, the United States argues that Plaintiff's claims actually 'accrued' when Plaintiff "knew of the existence and the cause of his injuries" (Defendant's Supplement Memorandum, pp. 1-2), which date, the United States asserts, is the date Plaintiff's attorneys filed his Petition to Set Aside his conviction (i.e. March 27, 2002)[2].  The United States alternatively argues that Plaintiff has failed to exhaust his claims pursuant to 28 U.S.C. § 2675, and, that said claims are barred by the FTCA's "discretionary function" exclusion.  Notwithstanding the United States' assertions, Plaintiff's Negligence claims are correct, timely, properly pleaded, and viable under the laws of the District of Columbia and the United States.

---

[1] It is noteworthy that until recently, the FBI Laboratory was not an accredited scientific laboratory.

[2] The United States argues erroneously, that unlike claims for false imprisonment, Plaintiff's negligence claims are not linked to his conviction and sentence.  Such an argument is unconvincing and without merit.

For the reasons set forth herein below, this Honorable Court has full and proper jurisdiction over Plaintiff's claims and the United States' Motion to Dismiss should be denied. Plaintiff submits that each of the arguments and defenses raised by the United States must fail and Plaintiff must be permitted to assert and go forward on his (remaining) FTCA claims, conduct pretrial discovery and ultimately prove his case against the United States.

## II.    LAW AND ARGUMENT

### A.    Bragdon's FTCA Claims Are Timely and Were Filed Within The Statute Of Limitations Period

As previously, submitted, under the United States Code the following time period applies to a claim brought pursuant to the FTCA:

> A tort claim against the United States shall be forever barred unless it is presented in writing to the appropriate Federal agency *within two years after such claim accrues* or unless action is begun within six months after the date of mailing, by certified or registered mail, of notice of final denial of the claim by the agency to which it was presented.

28 U.S.C. § 2401(b).

In 1994, the United States Supreme Court held that claims for damages, premised upon a wrongful conviction or imprisonment are not "cognizable" until the conviction is actually "reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal...,or called into question by a federal court's issuance of a writ of habeas corpus." Heck v. Humphrey, 512 U.S. 477, 487 (1994) (prisoner's §1983 claim premised upon unlawful conviction could not be brought until conviction set aside). In Heck, the Court reasoned that permitting such an action would imply the invalidity of the criminal conviction. Id. Thus, Heck prohibits a prisoner from asserting a claim based upon acts that resulted in a conviction *until* that conviction is set aside in some fashion. Id. Federal Appellate decisions have extended the reasoning in Heck to prohibit

claims under the FTCA until the conviction is extinguished.  See, Parris v. U.S., 45 F.3d 383 (10th Cir. 1995) (affirming summary judgment on FTCA claim where claim brought prior to conviction being set aside); Hinton v. U.S., 91 Fed. Appx. 491 (6th Cir. 2004) (affirming summary judgment on FTCA claim where prisoner's claim brought prior to conviction being set aside).  Consequently, under Heck, a former prisoner's claim cannot and does not accrue under the FTCA until and unless a conviction is *actually vacated.*  Such reasoning, which has also come to be known as the 'Heck Rule' is clearly applicable in the instant case and thus Plaintiff's claims here under the FTCA, be they based upon negligence or other tortuous conduct, are timely.

Plaintiff's conviction was set aside by the Superior Court for the District of Columbia on March 14, 2003.  Prior to that date, the law precluded Bragdon from asserting an FTCA cause of action claiming a wrongful conviction.  Therefore, Bragdon possessed two years from the Superior Court's decision - until March 14, 2005 - to assert his FTCA claims, which he did by filing his Standard Form 95's with both the FBI and the United States Department of Justice on March 9, 2005.  Accordingly, Bragdon's claims are timely filed, this Court has proper subject matter jurisdiction, and the United States' argument fails, as a matter of law.

**B.    Plaintiff Properly Exhausted His Negligence Claims in Accord with 28 U.S.C. § 2675**

The United States' stated position that Plaintiff failed to heed the requirements of 28 U.S.C. § 2675 is insupportable.  In fact, Plaintiff has duly and correctly complied with the presentation requirements for the proper exhaustion of his claims.

28 U.S.C. § 2675 provides:

> **(a)** An action shall not be instituted upon a claim against the United States for money damages for injury or loss of property or personal injury or death caused by the negligent or wrongful act or omission of any

employee of the Government while acting within the scope of his office or employment, unless **the claimant shall have first presented the claim to the appropriate Federal agency and his claim shall have been finally denied by the agency in writing** and sent by certified or registered mail. The failure of an agency to make final disposition of a claim within six months after it is filed shall, at the option of the claimant any time thereafter, be deemed a final denial of the claim for purposes of this section. The provisions of this subsection shall not apply to such claims as may be asserted under the Federal Rules of Civil Procedure by third party complaint, cross-claim, or counterclaim.

**(b)** Action under this section shall not be instituted for any sum in excess of the amount of the claim presented to the federal agency, except where the increased amount is based upon newly discovered evidence not reasonably discoverable at the time of presenting the claim to the federal agency, or upon allegation and proof of intervening facts, relating to the amount of the claim.

**(c)** Disposition of any claim by the Attorney General or other head of a federal agency shall not be competent evidence of liability or amount of damages. (emphasis added.)

        In order to maintain a claim under the FTCA, a plaintiff must first exhaust his administrative remedies by "present[ing] the claim to the appropriate Federal agency . . .." 28 U.S.C. § 2675.  The exhaustion of administrative remedies is a jurisdictional prerequisite.  See, GAF Corp. v. United States, 818 F.2d 901, 917-21 (D.C. Cir. 1987); Jackson v. United States, 730 F.2d 808, 809 (DC. Cir 1984); Office of Foreign Assets Control v. Voices in Wilderness, 329 F.Supp.2d 71, 83 (D.D.C. 2004) (some citations omitted).  Here, Plaintiff has fully satisfied the requirements of 27 U.S.C. § 2675 in the filing of his administrative claim(s) and has thus exhausted his administrative remedies. Plaintiffs' Standard Form 95 ("SF-95") claims were presented to the FBI and the United States Department of Justice within two years of the D.C. Superior Court's Order. Plaintiff's SF-95 claims were denied by letter from the United States Department of

Justice Federal Bureau of Investigation dated August 17, 2005 (See, Compl. Exh. C), and this action was timely filed.

In <u>GAF Corp. v. United States</u>, <u>Id.</u>, the Court noted that proper presentment under § 2675 entails the filing of "(1) **a written statement sufficiently describing the injury to enable the agency to begin its own investigation**, and (2) a sum certain damages claim." <u>GAF.</u>, 818 F.2d at 919 (emphasis added, some citations omitted). Plaintiff has satisfied this two-prong requirement. Clearly, Plaintiff has provided sufficient descriptions of his injury and furthermore stated his claims in an appropriate manner to enable the United States and the FBI to investigate what had actually occurred in the investigation and prosecution of Plaintiff Anthony Bragdon's criminal case.

The United States' assertion that Plaintiff's SF-95s are/were somehow insufficient is disingenuous, especially in light of the D.C. Superior Court's Order vacating Plaintiff's conviction, the reasoning and content of the opinion of the D.C. Superior Court, and the nature and substance of the published 1997 OIG special report which focused on the practices and alleged misconduct in cases investigated and reviewed at the FBI Laboratory. Plaintiff further argues that his submission of two separate Standard Form 95's – served separately upon both the FBI and the United States Department of Justice - containing the summary statement below (mentioned in the United States' Supplement Memorandum) was sufficient to put the FBI and the United States Department of Justice on notice of Plaintiff's injury.

Plaintiff's SF- 95's (submitted March 9, 2005) contained the following summary statement of injury in Box #10 of the form, labeled "PERSONAL INJURY/WRONGFUL

DEATH", asking Claimant to **"STATE NATURE AND EXTENT OF EACH INJURY OR CAUSE OF DEATH, WHICH FORMS THE BASIS OF THE CLAIM"**:

> Based upon the false and wrongful testimony, actions, and inactions of the Federal Bureau of Investigations and the United States Department of Justice, Claimant suffered an abuse of process, malicious prosecution, and was caused to be falsely accused, wrongfully arrested and falsely imprisoned for several years. Claimant was further caused to suffer injury and harm due to the intentional and/or negligent infliction of emotional distress.

See, Compl. Exhs. A & B.

Plaintiff submits that although the foregoing is enough to sufficiently summarize and describe Plaintiff's injury in accordance with statue to enable the FBI and the United States Department of Justice to commencing an investigation[3] of Plaintiff's claims, the United States mentions, but then dismisses and fails to reiterate in its Supplement Memorandum, the additional detail of injury provided by Plaintiff on the Standard Form 95 Attachments (referenced as Attachment "A" on each separate Form 95, Compl. Exhs. A & B) also served upon the FBI and the United States Department of Justice.

The Standard Form Attachments included the following detail of injury:

---

[3] It is noted and can be argued that the United States should already have been on "notice" of Plaintiff's claims relative to the FBI and/or United States Department of Justice' actions and inactions in connection with Plaintiff's injury claims through the Office of the Inspector General's 1997 Special Report. The United States seems to be arguing that the existence/publication of that 1997 Report should have somehow placed more constraints on the manner in which Plaintiff filed his Standard Form 95's. To the contrary, unless the United States is conceding all of Plaintiff's injuries and causes of action, said Special Report was the catalyst to enable Plaintiff's then-counsel to research and discover the facts and to then petition the D.C. Superior Court for the vacation of Plaintiff's conviction. Notably, Plaintiff's efforts to vacate his conviction were hard-fought and concessions were not handed over on a platter by the United States during those proceedings. Indeed, the United States' confirmation now of the "falsity of the (agent's) report" and, its admission of the "obvious fatal defect in the government's criminal case against (Plaintiff)" (Supplement Memorandum, p.4) would surely have been welcome news at the time Plaintiff petitioned to set aside his conviction.

On May 22, 1991, Claimant Anthony Bragdon was <u>Indicted</u> in the Superior Court, District of Columbia, on numerous charges including: assault with a deadly or dangerous weapon; kidnapping while armed; rape while armed; sodomy; assault with intent to      commit sodomy while armed; armed robbery; possession of a firearm during a crime of violence; first-degree theft; unauthorized use of a motor vehicle ("UUV"); and receiving stolen property ("RSP").  On September 19, 1991, the first-degree theft, UUV, and RSP counts were severed for purposes of trial.

At Claimants criminal trial, the United States Government (the United States Department of Justice) presented the fact/expert testimony of Federal Bureau of Investigations ("FBI") Lab personnel who gave testimony concerning the FBI's laboratory evidence, and the FBI's findings and conclusions concerning the hair and fiber evidence found and presented in the case.  Such testimony was false, incomplete, unsupported, and incorrect.  The FBI witness gave false testimony that the fibers found on the complaining witness' clothes matched the carpet in Claimant's apartment.  The FBI witness' trial testimony was materially false as to the following: 1) the nature and absence of other possible sources of the fiber; 2) the non-disclosure of other, non-matching fibers found, and, 3) the fact that the testing performed was insufficient to support the FBI's conclusions.  In addition, the FBI  withheld exculpatory information from Claimant and his defense counsel.

In or around April 1997, the United States Department of Justice, Office of the Inspector General, issued a Special Report titled, "The FBI Laboratory: An Investigation Into Laboratory Practices and Alleged Misconduct in Explosives-Related and Other Cases" which identified FBI personnel who had falsified work.  Thereafter, an independent scientist, conducted a subsequent analysis and report of the FBI's work on the evidence in Claimant's case.  In or around August of 2001, the Government forwarded such report to Claimant's counsel who then filed a Petition to Set Aside, Vacate, and/or Correct Conviction and Sentence, or in the Alternative, for a Writ of Coram Nobis on Claimant's behalf.  The <u>Superior Court issued an Order Granting Claimant's Petition on March 14, 2003, finding that the FBI witness' testimony was either false or not supported by said witness' notes, and further found that potential exculpatory facts regarding the fiber evidence was not disclosed.</u>  Claimant was subsequently released from prison.

<u>As the result of the actions, inactions, wrongful and tortious conduct of the Federal Bureau of Investigations and the United States Department of Justice, Claimant was imprisoned for many years and suffered extreme fear, emotional distress, pain, shock, horror, suffering, psychic injury,</u>

<u>loss of earnings, humiliation, loss of education, loss of enjoyment of life, monetary expenses, and other harm and injury.</u> (emphasis added.)

Compl. Exhs. A, Attachment "A" & B, Attachment "A".

As this Court is aware based upon the pleadings in the companion <u>Bivens</u> case which was voluntarily dismissed (Case No.:1:05-CV-00488 (JR)) , Plaintiff initially believed the actions, errors and/or mis-conduct of Agent Michael Malone was the result of an intentional and malicious wrongdoing on his part .  Now, after some initial discovery in that case, it has become more evident that fault and responsibility for Plaintiff's injuries lies more clearly with the United States.   The injuries suffered by Plaintiff and the underlying circumstances which occurred lead to a reasonable conclusion of negligence on the part of the United States.

Plaintiff Anthony Bragdon has met the presentment requirements of 28 U.S.C. § 2675 and had furthermore provided the agencies involved with sufficient information to begin their own investigation(s) in accord with the standard established in <u>GAF.</u> Plaintiff's description of what happened and the injuries he sustained clearly give rise to claims of negligence against the FBI and the United States Department of Justice and his claims against such agencies have been properly exhausted.

### C.    Claims for Negligence Properly Recognized under the FTCA

In the instant case, the United States argues that Plaintiff's allegations of negligence are somehow summarily barred by the FTCA's exclusion of discretionary functions.  The "discretionary function" exception to the FTCA confers immunity over claims "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of the federal agency or an employee of the

Government, whether or not the discretion involved be abused."  28 U.S.C. § 2680(a).

"The purpose of this exception is to 'prevent judicial second-guessing' of legislative and

administrative decisions founded in social, economic, and political policy through the

medium of an action in tort.'" Coyne v. United States, 270 F.Supp.2d 104 (D.Mass

2003), quoting Berkovitz v. United States, 486 U.S. 531, 536-537 (1988).  Plaintiff

submits that the "discretionary function" exception does not apply here.

In Muniz-Rivera v. United States, 326 F.3d 8 (1st Cir 2003) the First Circuit

described the analysis to be used when reviewing a "discretionary function" defense, to

wit:

> First, an inquiring court must identify the conduct that allegedly
> caused the harm.  Then, in determining whether Congress sought
> to shelter that sort of conduct from tort liability, the court must ask
> two interrelated questions: (1) is the conduct itself discretionary?
> (2) If so, does the exercise of discretion involve (or is it susceptible
> to) policy-related judgments?

Muniz-Rivera, at 15.

In this case, Plaintiff has done more than just made general allegations against the

United States.  Here, Plaintiff brings his claims based on the acts, omissions, and

negligence of the FBI/United States Department of Justice.  Plaintiff's claims against

Defendant, including the negligent investigation of the criminal case against him, the

running a **non-accredited** scientific laboratory; and, the negligent hiring, training, and

supervision of its personnel, are properly before this Court.

The actions and negligence of the FBI/United States Department of Justice

resulted in the mis-handling of the investigation and prosecution of the underlying

criminal case against Plaintiff Anthony Bragdon and the serious and devastating injuries

he ultimately suffered upon his conviction and incarceration. Such conduct is most certainly not *discretionary* under the FTCA exception.

In the case of <u>United States v. Gaubert</u>, 499 U.S. 315 (1991), the United States Supreme Court set forth a two-part test for determining whether particular challenged government action is protected as a "discretionary function" and thus excluded under the FTCA. First, the test provided that the "discretionary function" exception "covers only acts that are discretionary in nature, acts that 'involv[e] an element of judgment or choice." <u>Gaubert</u>, 499 U.S. at 322 (quoting Berkovitz, 486 U.S. at 536). This "requirement of judgment or choice is not satisfied if a 'federal statute, regulation or policy specifically prescribes a course of action for an employee to follow.' " <u>Gaubert</u>, 499 U.S. at 322 (quoting Berkovitz, 486 U.S. at 536). Second, the test provided that even if "the challenged conduct involves an element of judgment," that judgment must be "of the kind that the discretionary function exception was designed to shield." <u>Gaubert</u>, 499 U.S. at 322-23 (quoting <u>Berkovitz</u>, 486 U.S. at 536).

The purpose of the "discretionary function exception" was designed to " 'prevent judicial "second guessing" of legislative and administrative decisions grounded in social, economic and political policy through the medium of an action in tort,' " the Court concluded that "the exception 'protects only governmental actions and decisions based on considerations of public policy.' " <u>Gaubert</u>, 499 U.S. at 323 (quoting <u>Berkovitz</u>, 486 U.S. at 537).

In <u>Gaubert</u>, the United States Supreme Court gives an excellent, yet simple example of the appropriate inquiry relative to finding or not finding whether a "discretionary function" exception, is/was available.

In <u>Gaubert</u>, the Supreme Court explained:

> There are obviously discretionary acts performed by a Government agent that are within the scope of his employment but not within the discretionary function exception because these acts cannot be said to be based on the purposes that the regulatory regime seeks to accomplish.  If one of the officials involved in this case drove an automobile on a mission connected with his official duties and negligently collided with another car, the exception would not apply.  Although driving requires the constant exercise of discretion, the official's decisions in exercising that discretion can hardly be said to be grounded in regulatory policy.

Gaubert, at 325, n.7.

Under the facts and circumstances in this case, finding a "discretionary function" exception would be erroneous and a gross miscarriage of justice.  The entire premise of the Federal Tort Claims Act is to permit claimants to bring civil actions for money damages against the United States for personal injury or property damage caused by the negligent or wrongful act or omission of a government employee, acting within the scope of his employment, in circumstances where the United States would, if it were a private person, be liable in accordance with the law of the place where the negligent or wrongful act or omission occurred.

Here, Plaintiff submits that this Honorable Court has valid subject matter jurisdiction over Plaintiff's claims, including the negligence involved in Defendant's investigation of Plaintiff and charges against him; the negligent running of the FBI's non-accredited laboratory; and the negligent hiring, training and supervision of FBI personnel. All such claims involve conduct involving more than merely a "discretionary function" and are thus properly brought before this Court under the FTCA.

Negligence in the instant case, amounts to more than acts considered merely discretionary.  Indeed, as illustrated below, the non-existence of any lab certification, the absence of minimum hiring standards, lack of qualified training and oversight, and/or absence of written

lab and personnel policy and procedures, was more than just a matter of mere discretion or judgment.

As illustrated below, the United States' conduct during the investigation and prosecution of Plaintiff's criminal case was clearly negligent.  Not only did the FBI run a Laboratory that was not accredited, the insufficient training offered by the FBI to its Special Agent/laboratory analysts who were responsible for the handling and testing of evidence included little more than the following: unsupervised field training with no formal classes or written examinations; reading non-specified scientific literature; oral "moot courts" (which literally amounted to oral training on how to survive cross examination when giving testimony in a courtroom); attendance for two weeks at Hair and Fiber School; and (in the case of Agent Michael Malone) two courses at the University of Virginia.  Additionally, it is important to note that the FBI had no written protocol relative to the handling and testing fiber evidence at the time Plaintiff's case was handled.  Furthermore, there was no logical or written procedure for the testing of known versus unknown samples of evidence [4].  Quite frankly, the FBI Laboratory appears to have been run quite casually, day-to-day, without any formal, written, scientific direction, with analysts just going from case to case, without any standards, doing whatever they wanted.

Plaintiff understands that many of the problems in existence at the FBI and the FBI Laboratory may have been improved or even corrected since the publication of the OIG's 1997 Special Report, however, the fact remains that the casual, informal, and non-scientific atmosphere at the lab ultimately led to disaster in Plaintiff's case.  The conclusions of Agent

---

[4] It is noted here that the erroneous/false conclusions made by Agent Malone relative to the fiber evidence he tested in Plaintiff's case were the foundation for the D.C. Superior Court's setting aside of Plaintiff's conviction.

Michael Malone (the lab's senior analyst) as revealed in the OIG Special Report were related to and the result of the FBI's negligence, lack of training, supervision and procedure.

      Briefly, by way of offering examples, and by no means attempting to address all of the procedural and technical problems at the FBI and the FBI laboratory, Plaintiff offers some testimony from Michael Malone (as taken in the companion <u>Bivens</u> case (Case No.:1:05-CV-00488 (JR)) as an illustration and example of the casual and non-specific/ non-scientific manner in which cases were investigated and processed (and in by which personnel were trained to work) in the FBI lab.  Additional discovery is expected to reveal more succinctly the deficiencies in hiring, training, and supervisory protocol and procedures at the FBI.

      Agent Michael Malone, who earned a B.S. in Biology in 1968, a Masters of Science in 1970 and taught briefly at a high school then at a military academy for a year prior to becoming a Special Agent with the FBI Crime Laboratory, gave the following testimony concerning his FBI training as a hair and fibers expert.

_____

```
          Q    All right, now, taking you into your becoming

     an agent, could you briefly describe the training that

     you received from the FBI?

          A    It was a 13 or 14-week course.  Part of it

     was in Washington, DC.  Part of it was in the Academy

     but that was before the real Academy exists, the Academy

     we have today.

          Q    Uh-huh.
```

A    So we did part of it in DC.  It was basically courses in law, basically Bureau procedures, paperwork, things like that, and we did all our firearms training down at the FBI Academy in Quantico, then came back up to Washington and completed.  It was 13 or 14 weeks though.

Q    Okay.  Now, when you went into the Hair and Fibers Unit, did you require any additional or specialized training?

A    Yeah, my entire first year at the Hair and Fiber Unit was in a training mode.

Q    Okay, and could you describe what that training mode was or entailed?

A    The bulk of it required examining literally thousands of samples of hairs and fibers.  Then I had to read the available literature in the field, have series of moot courts during this time.  At the end of the last month or two of my training I was able to assist on cases but they weren't mine.  I was assisting another examiner and then finally the end of the process, after a year, I was qualified by the Director as a Hair and Fiber Examiner.

Q    Did that qualification process entail any kind of written exam?

A    No, oral boards and moot courts.

Q    Okay.  And those moot courts, were those, for lack of a better word, pretend courtroom situations that were led or directed by analysts working as --

A    Examiners, correct.

Q    Examiners as the lawyer and the -- or you'd be the witness and they'd cross examine you.

A    That's correct.

Q    Okay.

A    Oh, I forgot one thing.  I did -- I attended the official Hair and Fiber School at the Academy at Quantico.  I think that was two weeks long.

Q    Okay, and that would have been around 1974 when you began in that unit?

A    `74//'75.

Q    Okay.  What about did you have any serology training?

A    No.  I did receive post-graduate training from the University of Virginia, two courses in molecular biology.  This was I believe in the `90's.

Q    Okay.

A    And got official credit from the UVA.  They were both post-grad courses in molecular biology.

Q    Okay.  Was becoming a part of the Hair and Fibers Unit a product of your having the right background or did you choose or try to get into that on your own accord.

A    No, I was selected.

Q    Okay.  Okay, so pretty much since `74/'75 you've been a Hair and Fibers Examiner.

A    Right.

Q    And you were --

A    Until 1994.

(See, Deposition of Michael Malone, Tuesday August 22, 2006, pp. 11-14, Attached.)

In addition to the lack of formalized training of its lab analysts, it is apparent that the FBI laboratory, at the time Plaintiff's case was handled, lacked adequate protocol requiring the lab analysts (who performed scientific testing on evidence samples) follow any specific, consistent, logical, or scientific written procedure(s):

_____

Q    Okay.   Now, at the time of Mr. Bragdon's case, was there a written procedure manual of how evidence was to be handled at the lab?

A    I don't know.

Q    Did the lab have it's own SOPs?

A    Correct, we did.

Q    Okay.

A    And in answer to your previous question, we did put out a manual to local law enforcement on how to handle evidence.

Q    Okay,

A    But as far as an in-house one --

Q    Right.

A    -- I don't know.

Q    Okay, well, would those in-house procedures have been covered in the SOPs?

A    When you say SOPs, I was never a Unit Chief, correct, so any documents like that would have been kept in their office.  When I began 20 years ago or in 1974, we didn't have any such documents.  Now, have they created them since then?  I don't know, but I know I didn't have to review them or anything like that.

```
          Q    Right,  okay.   So  then  was  the  informal

     procedure  for  handling  evidence  just  something  that  was

     learned  in  training  but  not  written  down?   Is  that  fair?

          A    That's  fair  because  that  was  definitely  one

     of  the  things  we  learned  during  my  years  of  training.
```

(See, Deposition of Michael Malone, Tuesday August 22, 2006, p. 23, Attached.)

Finally, as another example of the FBI's negligence, Plaintiffs note that there appears to have been no actual scientific testing method by which the conclusions of analysts looking at evidence were *confirmed, re-tested* or *double-checked*.

_____

```
          Q    Okay.   All  right.   When  you're  making  your

     comparisons  under  the  comparison  microscope,  was  there

     any  procedure  at  the  FBI  lab  where  your  conclusion  about

     the  comparison  was  reviewed  by  someone  else?

          A    No.   We  had  that  for  hairs  but  not  for

     fibers.
```

See, Deposition of Michael Malone, Tuesday August 22, 2006, p. 27, Attached.

### D.    Dismissal Under Fed. R. Civ. P. 12 is Not Appropriate

In this case, as set forth in sections II. A, B, and C above, this Honorable Court has full and proper subject matter jurisdiction over the claims filed by Plaintiff.

In connection with a request for dismissal under Rule 12 of the Federal Rules of Civil Procedure, the Court must assume that the facts pleaded in the Complaint are true and ***draw all factual inferences in favor of the non-moving party***. Banks v. District of Columbia, ---F.2d---, 2005 WL 1595298 (D.C. Cir. decided July 8, 2005)(citing standard for 12(b)(6) dismissal). Here, not only are the facts pleaded in Plaintiff's Complaint true, they have been endorsed by the D.C. Superior Court through its vacating Plaintiff's underlying conviction which resulted from the conduct of the United States.

A motion to dismiss should be denied "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45 (1957). The likelihood that the plaintiff will ultimately prevail is not material to the court's determination. See Scheuer v. Rhodes, 416 U.S. 232, 236 (1974); In re Burlington Coat Factory Sec. Litigation, 114 F.3d 1410, 1420 (3rd Cir. 1997). Therefore, dismissal under Fed. R. Civ. P. 12(B)(6) is appropriate only where a plaintiff could not be granted relief "under any set of facts that could be proved consistent with the allegations." Gasoline Sales, Inc. v. Aero Oil Co., 39 F. 3d 70, 71 (3rd Cir. 1994)(citing National Org. For Women v. Scheidler, 510 U.S. 249, 255-56 (1994)). In the case at bar, Plaintiff can prove facts and circumstances which in support of his claims that would allow him relief and thus his claims should not be dismissed.

## III.    CONCLUSION

For all of the foregoing reasons and authorities cited, Plaintiff Anthony Bragdon herein respectfully requests that the Honorable Court deny the Defendant's Supplement Memorandum in Support of its Motion to Dismiss, and permit him to proceed against the United States on his

FTCA claims and the allegations set forth against the United States in his First Amended

Complaint.

Respectfully submitted,


 /s/  Richard G. Lillie                        .
Richard G. Lillie (DC# 427882)
Gretchen A. Holderman (OH#0058508)
75 Public Square, Suite #1313
Cleveland, Ohio 44113
Telephone: (216) 861-1313
Facsimile:  (216) 861-1314
Email: lillie13@sbcglobal.net

## <u>CERTIFICATE OF SERVICE</u>

The foregoing, Plaintiff's Memorandum in Opposition to Defendant's Supplement

Memorandum in Support of its Motion To Dismiss, was filed electronically on April 23, 2007.

Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.

Parties may access this filing through the Court's system, or, if this means fails, then by first

class mail, postage prepaid, addressed to:

Jeffrey A. Tayloor
United States Attorney
Office of the United States Attorney
Civil Division
555 4th Street, N.W.
Washington, D.C. 20530

Rudolph Contreras
Assistant United States Attorney
Office of the United States Attorney
Civil Division
555 4th Street, N.W.
Washington, D.C. 20530

Oliver W. McDaniel
Assistant United States Attorney
Office of the United States Attorney
Civil Division
555 4th Street, N.W.
Washington, D.C. 20530


/s/ Richard G. Lillie
Richard G. Lillie