IN THE UNITED DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


IN THE MATTER OF:

ANTHONY BRAGDON
7170 Mahogany Drive
Hyattsville, Maryland 20785

        Plaintiff,     Civil Action No.
v.           1:05-CV-00488(JR)

MICHAEL MALONE
5701 Cedar Trail West
Prince George, Virginia 23875
   and
JOHN DOES 1-10
Individual Persons, Whose
Names and Identities Cannot
Be Ascertained at This Time
Despite Due Diligence

        Defendants.


Tuesday, August 22, 2006

ORAL DEPOSITION OF

MICHAEL MALONE

called for examination by counsel for Plaintiff
pursuant to notice of deposition, in the offices of
Kohn, Kohn, and Colapinto, 3238 P Street N.W.,
Washington, D.C., when were present on behalf of the
respective parties:

APPEARANCES:

On Behalf of the Plaintiff:

GRETCHEN A. HOLDERMAN, ESQ.
        Benesch
        Friedlander, Coplan & Aronoff, LLP
        Attorneys at Law
        2300 BP Tower
        200 Public Square
        Cleveland, OH 44114-2378
        216-363-4500
        mobile: 216-789-0734
        gholderman@bfca.com


        On Behalf the Defendant:

        PAULA M. POTOCZAK, ESQ.
        Law Office of Paula Potoczak, L.L.C.
        1010 Cameron Street
        Alexandria, VA 22314
        703-519-3733


        On Behalf of the Federal Bureau of
        Investigation:

        N. JOHN BENSON, JR., ESQ.
        Assistant General Counsel
        935 Pennsylvania Ave. N.W.
        Washington, D.C. 20535
        202-220-9323

1                    P-R-O-C-E-E-D-I-N-G-S

2                                        10:58 A.M.

3              MS.  HOLDERMAN:   Could  you  swear  in  the

4     witness?

5              THE  REPORTER:   Please  raise  your  right

6     hand.

7     Whereupon,

8                    MICHAEL MALONE

9     was  called  as  a  witness  and,  having  been  first  duly

10    sworn,  was  examined  and  testified  as  follows:

11             MS.  HOLDERMAN:   Mr.  Malone,  my  name  is

12    Gretchen Holderman and as you know, we're here for the

13    purposes  of  deposition  in  the  case  of  Bragdon  versus

14    Malone.   I'm  going  to  just  set  a  couple  groundrules.

15    If  you  don't  understand  any  of  my  questions,  I  would

16    ask  you  to  let  me  know  that  because  if  you  answer

17    them,  I'll  assume  that  you  do.   I  want  you  to  remember

18    to  speak  your  answers  instead  of  using  gestures  or

19    nods  of  your  head.   And  if  you  need  a  break  at  any

20    time  or  need  a  chance  to  talk  to  your  counsel,  please

21    feel  free  to  just  let  me  know  and  I  think  that's  it.

22    Do  you  have  any  questions?

4

1          THE WITNESS:  No.

2          MS. HOLDERMAN:   All  right,  for  the

3  purposes of the record, could you please state your

4  name and spell your last name?

5          THE WITNESS:  It's Michael P. Malone, M-a-

6  l-o-n-e.

7          MS. HOLDERMAN:  Okay, and I would also put

8  on the record that there is a protective order in this

9  case  and  to  the  extent  that  we  would  be  using  any

10  documents  that  have  been  submitted  to  us  under  that

11  protective  order,  that  the  order  would  obviously

12  stand.

13                   EXAMINATION

14          BY MS. HOLDERMAN:

15     Q    Mr. Malone, what is your current employment?

16     A    I am retired but I do backup investigations

17  for the FBI.

18     Q    Okay,  in  that  capacity  are  you  a  private

19  contractor?

20     A    Yes, contractor.

21     Q    All right.  Is that something like a private

22  investigator?

1      A    It basically -- something like it.  I'm not

2   a licensed private investigator.  We're sent cases and

3   we talk to the people, who is on their application,

4   verify it, write up a report, send it back to -- it's

5   called BICS, B-I-C-S, headquarters.

6      Q    Okay, is that primarily what you would do

7   for the FBI is background checks?

8      A    The Bureau used to use agents, active agents

9   for that, but it quit doing that so basically they use

10  retired   agents   as   contractors   now   for   that

11  investigations.

12     Q    Okay.

13     A    And also for security clearances.

14     Q    You  mean,  when  they're  looking  to  give

15  someone a security clearance.

16     A    Well, yeah, for hire-ins, too, you have to

17  get a security clearance.  Of course, this is part of

18  the security clearance process.

19     Q    Okay, all right.  When did you start that

20  background investigation business?

21     A    Let's see, 2003, I believe.

22     Q    Okay.  And when did you retire from the FBI?

6

1        A    December 31st, 1999.

2        Q    Did you work at all between January of 2000

3    and when you started the business in 2003 for

4    background investigations?

5        A    No.

6        Q    Okay, you enjoyed your retirement for the

7    moment.

8        A    Yes.

9        Q    Good.   I want to ask you about your

10   employment with the FBI and ask you to give me, I

11   guess, an overview of your employment from the time

12   you started until your retirement in `99.

13       A    I graduated from new agents' class in

14   November of `70.   My first office was Cincinnati.   I

15   was at the Cincinnati office basically `71/'72.  `72 I

16   was assigned to the New York Field Office.   I stayed

17   there until September of `74.   `74, I was assigned to

18   the Hairs and Fibers Unit, the FBI Lab in Washington.

19    I stayed there till `94.   In `94, I was transferred

20   to the Norfolk Office.   I was there till `97 and

21   retired in `99 out of -- I was transferred to the

22   Richmond Office in `97 and retired out of the Richmond

1    Office.

2        Q    Okay.    When you began in the Cincinnati

3    office out of your Agent Class, what was your title or

4    job classification?

5        A    Well, I was  a Special Agent, but that was

6    back  in  the  Dark  Ages.    Your  first  office  was

7    considered a training office, what they called the

8    First Office Agents and then basically after one year

9    in  that  office,  you  would  be  assigned  to  another

10    office but still a Special Agent.

11        Q    Okay, and as a Special Agent, did you work

12    in the field under -- in training?

13        A    I was a field agent basically from `71 till

14    I was assigned to the lab in `74.

15        Q    Okay, in `74, when you were assigned to the

16    Hair and Fibers Unit, did you -- did the FBI require

17    any special background from you?

18        A    Again, back then there were several ways to

19    become  an  Agent.    One  of  them  was  called  Modified

20    Program.

21            MS.  POTOCZAK:    You're  not  answering  the

22    question.  Repeat the question, please.

1          MS.   HOLDERMAN:    Could  you  repeat  the

2     question?  I can do it.

3          BY MS. HOLDERMAN:

4     Q    Before being assigned to the Hair and Fibers

5     Unit, did the FBI require you to have any special

6     background?

7     A    I did have a special background in science,

8     Masters in Science.

9          MS. POTOCZAK:  Okay, listen to the question

10    --

11         THE WITNESS:  Right.

12         MS.  POTOCZAK:    --  and  answer  only  the

13    question she asks.

14         THE WITNESS:  Okay.  They did not require my

15    particular background for the FBI.  It happened to fit

16    in.

17         BY MS. HOLDERMAN:

18    Q    Okay, all right, and then I'll ask you, what

19    was that background that fit in?

20    A    Okay, I had a Master of Biology, Bachelor of

21    Science in Biology, Master of Science in Biology, so,

22    of course, that made me an ideal candidate for the

1    lab.

2         Q    Uh-huh.

3         A    But I did not come in under the Science

4    Program.

5         Q    Okay, then I guess that begs the question,

6    under what program did you come under?

7         A    The Modified Program.

8         Q    Okay.  And what's the Modified Program?

9         A    The Modified Program, basically, required a

10   four-year degree, three years professional experience

11   and would cover things like military, police officers,

12   business professionals.

13        Q    Okay, I understand.  All right.  Do you

14   remember what year you got your Bachelor of Science in

15   Biology?

16        A    BS in 1968.

17        Q    Okay, and what about your Masters of

18   Science?

19        A    Masters in 1970.

20        Q    Okay, all right, and after attending your

21   Masters, could you tell me your employment from that,

22   1970 up until your employment as a Training Officer in

1    the Cincinnati Office or first year?

2         A    When I graduated in `68, I taught briefly

3    high school in Baltimore County.  Then I --

4         Q    Where is that?

5         A    Baltimore County?

6         Q    Yes.

7         A    It's by the City of Baltimore.

8         Q    Okay.

9         A    And I taught one year at Stanton Military

10   Academy which is in Stanton, Virginia.  And I taught I

11   believe it was three months in Fort Lauderdale as a

12   high school teacher and went into the FBI through the

13   Miami  Office,  so  I  was  very  briefly  in  Fort

14   Lauderdale.

15        Q    Okay, thank you.  When you were teaching in

16   Baltimore County, what did you teach?

17        A    Biology and general science.

18        Q    Okay.  And what about at Stanton Military?

19        A    The same.

20        Q    Okay, and how about in Fort Lauderdale?

21        A    The same.

22        Q    Okay.  While you were a teacher, did you

1    publish any articles?

2        A    No.

3        Q    All right.    Do you have a military

4    background?

5        A    No.

6        Q    All right, now, taking you into your

7    becoming an agent, could you briefly describe the

8    training that you received from the FBI?

9        A    It was a 13 or 14-week course.  Part of it

10   was in Washington, DC.  Part of it was in the Academy

11   but that was before the real Academy exists, the

12   Academy we have today.

13       Q    Uh-huh.

14       A    So we did part of it in DC.  It was

15   basically courses in law, basically Bureau procedures,

16   paperwork, things like that, and we did all our

17   firearms training down at the FBI Academy in Quantico,

18   then came back up to Washington and completed.  It was

19   13 or 14 weeks though.

20       Q    Okay.  Now, when you went into the Hair and

21   Fibers Unit, did you require any additional or

22   specialized training?

1        A    Yeah, my entire first year at the Hair and

2   Fiber Unit was in a training mode.

3        Q    Okay, and could you describe what that

4   training mode was or entailed?

5        A    The bulk of it required examining literally

6   thousands of samples of hairs and fibers.    Then I

7   had to read the available literature in the field,

8   have series of moot courts during this time.  At the

9   end of the last month or two of my training I was able

10  to assist on cases but they weren't mine.   I was

11  assisting another examiner and then finally the end of

12  the process, after a year, I was qualified by the

13  Director as a Hair and Fiber Examiner.

14       Q    Did that qualification process entail any

15  kind of written exam?

16       A    No, oral boards and moot courts.

17       Q    Okay.  And those moot courts, were those,

18  for lack of a better word, pretend courtroom

19  situations that were led or directed by analysts

20  working as --

21       A    Examiners, correct.

22       Q    Examiners as the lawyer and the -- or you'd

1    be the witness and they'd cross examine you.

2         A    That's correct.

3         Q    Okay.

4         A    Oh, I forgot one thing.  I did -- I attended

5    the official Hair and Fiber School at the Academy at

6    Quantico.  I think that was two weeks long.

7         Q    Okay, and that would have been around 1974

8    when you began in that unit?

9         A    `74//'75.

10        Q    Okay.  What about did you have any serology

11   training?

12        A    No.  I did receive post-graduate training

13   from the University of Virginia, two courses in

14   molecular biology.  This was I believe in the `90's.

15        Q    Okay.

16        A    And got official credit from the UVA.  They

17   were both post-grad courses in molecular biology.

18        Q    Okay.  Was becoming a part of the Hair and

19   Fibers Unit a product of your having the right

20   background or did you choose or try to get into that

21   on your own accord.

22        A    No, I was selected.

1          Q    Okay.  Okay, so pretty much since `74/'75

2     you've been a Hair and Fibers Examiner.

3          A    Right.

4          Q    And you were --

5          A    Until 1994.

6          Q    Okay.  While employed by the FBI were you

7     ever a faculty or a team member at any seminars or

8     professional institutes?

9          A    Well, I was one of the instructors for

10    several of the Hair and Fiber classes down at

11    Quantico, Virginia.  I wasn't on the official faculty

12    of the Academy but I gave several lectures down there

13    at the Academy.

14         Q    Okay, something like a guest lecturer?

15         A    Correct.

16         Q    During your employ as a Hair and Fibers

17    Analyst -- and at that time, let me just clarify this,

18    are you still a Special Agent?

19         A    No, retired Special Agent.

20         Q    No, no, no, no, no.  While you were an

21    Analyst, is that still considered just a Special

22    Agent?

1        A    Oh, yes, I was a Special Agent.

2        Q    Because I don't want to mix it up.  All

3    right, so then during your employ as a Special Agent,

4    did you have any publications?

5        A    Several publications.

6        Q    Okay, can you list those that you remember?

7        A    The -- in the law enforcement bulletin, I

8    had two publications; one of them on the Bobby Joe

9    Long serial murder case, one on the Kiki Camarena

10   case, that was the DE Agent that was killed in Mexico.

11       Q    Right.

12       A    I had a publication in the Police Chief

13   magazine on the Jeffrey McDonald case, the Fatal

14   Vision case and I was a contributing author to a text

15   book called -- they used some of my publications in

16   their book.   It was called "Criminalistics:  An

17   Introduction to Forensic Science".

18       Q    All right, and during your term as a Special

19   Agent, were you a member of any professional

20   associations?

21       A    Yes, I was in the American Academy -- a

22   fellow in the American Academy -- I'm sorry, a member

1    in the American Academy of Forensic Science.

2         Q    Anything else?

3         A    No.

4         Q    Okay.  You mentioned two cases that you had

5    that you had written some publications for and I know

6    that they were high profile cases.  I think that

7    you've been in a number of high profile cases; is that

8    accurate?

9         A    Yes.

10        Q    Can you remember any of those other cases?

11        A    I've done a lot --

12             MS. POTOCZAK:  Wait, wait, wait, what do you

13   mean by high profile?

14             BY MS. HOLDERMAN:

15        Q    Okay, what do you think I mean by high

16   profile?

17             MS. POTOCZAK:  No, no, no, no, no, you used

18   the term.  You define the term and let him answer

19   based on your definition.

20             BY MS. HOLDERMAN:

21        Q    Do you understand what I mean by high

22   profile case?

1      A    I believe I do.

2      Q    Okay.

3      A    About a dozen serial murder cases, which

4  were very high profile in their respective cities.

5  The Bobby Joe Long case was one of them, the Kiki

6  Camarena case, the Jeffrey McDonald case.  REGAT, the

7  attempted assassination of President Reagan.  That's

8  all I can remember right off the top of my head.

9      Q    Okay, fair enough.  All right, as a Hair and

10  Fiber Examiner, did you give testimony as an expert

11  witness in state and federal cases?

12      A    Yes.

13      Q    Do you have any idea how many times?

14      A    Approximately 500.

15      Q    Is it fair to say you've probably worked on

16  thousands of cases, though?

17      A    Yes.

18      Q    All right.  In the cases where you

19  testified, you were, in fact, qualified and accepted

20  as an expert by the Court, right?

21      A    In each and every case, correct.

22      Q    All right, now, besides this case, have you

1    ever been a party to a lawsuit?

2        A    No.

3        Q    Okay.  And that would include not having

4    every been a plaintiff either, correct?

5        A    That's correct.

6        Q    All  right.    All  right,  during  your

7    employment with the FBI, were you ever disciplined by

8    your superiors?

9        A    Not that I can recall.

10       Q    Okay, and when I say disciplined, so you're

11   clear,  I  mean,  official  warnings,  write-ups,

12   reprimands,  probation,  demotion,  letter  of  censure,

13   transfer, things of those nature.

14       A    None that I can recall.

15       Q    Okay.  All right, I would like to talk to

16   you now about Mr. Bragdon's underlying criminal case,

17   but before I do, I want to talk to you a little bit

18   about the DC Superior Court's order which actually

19   vacated his conviction.  And you're aware of that

20   order, correct?

21       A    Yes.

22       Q    All  right.    Could  you  tell  me  your

1    understanding, if you have any, of the DC Superior

2    Court's actions with respect to their discussion about

3    your work on that case?

4         A    I'm not a lawyer, but what I can understand

5    basically is the Judge said that I made some false

6    statements and that's basically it.

7         Q    Okay.  Do you know whether any other court,

8    besides the DC Superior Court in Bragdon has set aside

9    any convictions based upon any alleged error on your

10   part?

11        A    None that I'm aware of.

12        Q    And are you aware whether any court other

13   than the DC Superior Court has set aside any

14   conviction based upon an alleged -- any alleged

15   misconduct on your part?

16        A    None that I'm aware of.

17        Q    Okay.  In any other case, were you ever

18   accused of false testimony?

19        A    The only other case I can remember was the

20   Inspector General's case where they did the

21   investigation of the lab, yes.  I was -- I hate to say

22   that I had committed false testimony in that case.

1          Q    Okay, and --

2          A    That was actually Allison Hastings' case.

3          Q    Okay, one second.  I think I have that.

4    When you refer to the Inspector General case, are you

5    referring to the report that came out in 1997, April

6    which was an all-encompassed report of several

7    different cases that had been reviewed?

8          A    Yes, I believe it was me and several other

9    agents.

10         Q    Right, maybe another 12 agents or so,

11   correct?

12         A    Correct, correct.

13         Q    Okay.  All right, your lab identifying

14   initials are RQ; is that correct?

15         A    That's correct.

16         Q    All right.  Could you briefly summarize for

17   me what your involvement was in Mr. Bragdon's case?

18         A    I was the auxiliary examiner on the case,

19   which means I wasn't responsible for the case while it

20   was at the lab.  I did the hair and fiber work on the

21   case and then examined the evidence, gave some

22   dictation and eventually testified in the case.

1       Q    Okay, let me stop you right there.  You say

2   that you were an auxiliary examiner and you weren't in

3   charge of the case while it was at that lab.  Who

4   would have been in charge of the case while it was at

5   the lab?

6       A    Special Agent Robert Grispino(phonetic).

7       Q    And what would his title have been with

8   respect to the case?

9       A    He would have been the primary examiner.  We

10  called them PEs.

11      Q    Okay, and all right, before I know

12  specifically what you did as the auxiliary examiner,

13  do you know what Mr. Grispino did as the primary

14  examiner?

15      A    He made the serology examinations.

16      Q    Was he also in charge of overseeing the

17  file?

18      A    As primary examiner, you are responsible for

19  receiving the evidence, displaying the evidence,

20  having other examiners assigned, trading the evidence,

21  putting together the report and making sure it's

22  mailed out.

22

1        Q    Okay, and would the report that you referred

2    to be comprised of the summaries or conclusions of all

3    the other agents that did testing?

4        A    Yes, but there were only two.

5        Q    Okay, and in this case, would that have been

6    you and Mr. Grispino?

7        A    Correct.

8        Q    Okay.  At the time of Mr. Bragdon's case,

9    was your title that of Senior Examiner in the lab?

10       A    It wasn't an official title.  I was the

11   Senior Examiner.

12       Q    Meaning you had been there the longest?

13       A    Correct, in terms of seniority, but there

14   was no official title of Senior Examiner.

15       Q    Okay.  Now, at the time of Mr. Bragdon's

16   case, was there a written procedure manual of how

17   evidence was to be handled at the lab?

18       A    I don't know.

19       Q    Did the lab have it's own SOPs?

20       A    Correct, we did.

21       Q    Okay.

22       A    And in answer to your previous question, we

1    did put out a manual to local law enforcement on how

2    to handle evidence.

3         Q    Okay,

4         A    But as far as an in-house one --

5         Q    Right.

6         A    -- I don't know.

7         Q    Okay, well, would those in-house procedures

8    have been covered in the SOPs?

9         A    When you say SOPs, I was never a Unit Chief,

10   correct, so any documents like that would have been

11   kept in their office.  When I began 20 years ago or in

12   1974, we didn't have any such documents.  Now, have

13   they created them since then?  I don't know, but I

14   know I didn't have to review them or anything like

15   that.

16        Q    Right, okay.  So then was the informal

17   procedure for handling evidence just something that

18   was learned in training but not written down?  Is that

19   fair?

20        A    That's fair because that was definitely one

21   of the things we learned during my years of training.

22        Q    Okay.  In the Anthony Bragdon case, you

1     analyzed a number of fibers.  Do you recall?

2          A     Analyzed both hairs and fibers.

3          Q     Okay, all right.  With regard to the fibers

4     specifically, can you describe for me the method you

5     used in your analysis?

6          A     Yes, I can describe it.  We had a standard

7     procedure for examining fibers and we had a chart that

8     we'd fill in as we did this.  Basically, the first

9     step was to look at the fibers under a high powered

10    microscope, identify the fibers.  We would be looking

11    at both known and unknown fibers at this time.  We

12    would identify any unknown fibers we found, compare

13    them microscopically to the known samples to see if

14    you had any -- if they were the same.  You then did

15    what are called -- and the microscopic examination

16    consisted of the microscopic characteristics and the

17    color.

18          We had a very expensive color corrective

19    lens system on our microscopes.  We would then do

20    what's called optical exams where we would subject the

21    fibers, both the known and the unknowns to test using

22    white light and test using polarized light because all

1    our microscopes were equipped with a polarized light

2    system.   We would test how these fibers would react

3    to the white light to make sure the knowns and

4    unknowns were the same.   We would analyze how these

5    fibers would react to the polarized lights and by

6    doing this, we could identify the fiber.

7              The next test we did, this was on the

8    knowns, we did what's called a microsolubility test

9    where the known fibers would be subjected to many

10   different solvents and we had several solubility

11   schemes we used.   I don't remember what specific

12   scheme.   The final thing we did was to place the

13   fibers on what's called a microspectrophotometer and

14   this would be to distinguish the colors of the die,

15   exhibited by the die and see if they were the same,

16   and this machine actually printed out what's called an

17   absorption curve which it's almost like a spectro

18   fingerprint of the color to see if they were the same.

19    And this machine was very, very sensitive in that it

20   got to the point where it could distinguish between

21   colors that your eye could not.   At the end of that

22   process, if all of the characteristics of the unknown

1    fiber matched all the characteristics of the known

2    fiber, we then say these unknown fibers had the same

3    microscopic and optical properties as the known and

4    therefore, they were consistent in having originated

5    from that particular known.    Now, if any of the

6    properties were different, we would eliminate them as

7    a source.

8        Q    Okay, that optical exam, that was white or –

9    – it was what and --

10       A    Polarized.

11       Q    -- white and polarized light through the

12   particle or through the fiber, that was done under the

13   regular comparison microscope?

14       A    Yes.   The white light test was done under

15   the comparison microscope using standard white light

16   and then we would put the polarizing system, you'd

17   have filters and a instrument called a compensator on

18   the scope in order to do that tests with the polarized

19   light.   Of course, the other test we didn't use a

20   microscope.

21       Q    Okay.   But as far as the optical exam and

22   the light, both kinds of light, that was through the

1    microscope.

2         A    Correct.

3         Q    Okay.

4         A    And we used two different microscopes.  We

5    used what's called a stereoscope, low power, the high

6    power you'd need a microscope.

7         Q    Okay.  All right.  When you're making your

8    comparisons under the comparison microscope, was there

9    any procedure at the FBI lab where your conclusion

10   about the comparison was reviewed by someone else?

11        A    No.  We had that for hairs but not for

12   fibers.

13        Q    And in the example of hairs, who would have

14   been the person to review your conclusions if you had

15   any?

16        A    With respect to hairs, after I matched an

17   unknown hair to a known, I would have to give the

18   slides -- now, you've got to remember all these hairs

19   and fibers are on slides -- to another agent in the

20   unit.  The second agent would have to make the same

21   exam I did and come up with the same conclusion that I

22   did, in other words, agree with my conclusion and

1    initial it.   We had a sheet you filled out and you

2    initialed it.  We did not do that with fibers.

3        Q    Do you know why you didn't do that with

4    fibers?

5        A    No.

6        Q    You mentioned that you did a solubility exam

7    to the known sample.  Is there a reason why you didn't

8    do a solubility exam to the unknown sample?

9        A    Because it would have destroyed it.

10        Q    Would that have been done if there had been

11    a larger sample of the unknown?

12        A    If we'd have had a dozen fibers, maybe, but

13    normally we did the solubility test on the unknowns --

14    I mean, I'm sorry, on the known sample, and it was

15    mainly to confirm what we had determined from the

16    other tests.

17        Q    More as a double-checking, something like

18    that.

19        A    Correct.

20        Q    Solubility was a confirmation test.   Okay.

21     Was there any written or unwritten directive at the

22    lab not to do solubility on the unknown samples?

1          A     I don't know.  I've never seen one.

2          Q     Okay.  With regard to your analysis and use

3     of the microspectro --

4          A     Photometer.

5          Q     -- photometer, was there any double-checking

6     of your work and analysis on that by any other agent?

7          A     Yes, in that case, they put it on a graph

8     and the unit chief should have looked at that at time

9     that they signed out the case.  In other words, part

10    of the job of the unit chief was to review my

11    dictation, was to review my notes and these notes

12    would have been the absorption curves, in order to,

13    number one, I charted it right and a follow-up of

14    Bureau procedure.

15             If they agreed with it, they would initial

16    the dictation.

17         Q     Uh-huh, and was that done in the Bragdon

18    case?

19         A     I believe it was.  It's a little unusual why

20    I'm not positive.

21         Q     Uh-huh.  You can tell me that, why you're

22    not sure.

1          MS. POTOCZAK:  Well, she simply asked you

2     what  the  process  was,  and  actually,  there  was  no

3     question on the table.  So there's nothing to tell.

4     And if there's a question pending, ask a question and

5     then  answer  it,  but  if  there's  no  question  pending,

6     you don't volunteer information.  And I don't know how

7     many times I've told you that, but you don't seem to

8     want  to  listen.   So  if  there's  a  question  on  the

9     table,  you  answer  the  question  unless  it's

10     objectionable  but  I  don't  hear  a  question  on  the

11     table.

12          BY MS. HOLDERMAN:

13     Q    Well, then I know what you said.  You don't

14     know   whether   or   not   anyone   checked   your

15     microspectrophotometer results in Bragdon's case?

16     A    I think they did but I'm not sure.

17     Q    Okay.  Do you recall who your unit chief was

18     during the Bragdon case?

19     A    I believe it was Alison Simons, but I'm not

20     sure.

21     Q    What was that last name?

22     A    Alison Simons or Simon.  It's either S-I-m-

1      o-n or S.

2          Q    Okay.   Fair enough.   Concerning the results

3      of the optical test, is there any standard deviation

4      or is there a certain result?

5          A    Just a result.

6          Q    Okay, and what about the results on the

7      microspectrometer test?

8          A    Again, it's a graph and you're trained how

9      to read these graphs and it's your opinion on whether

10     they match or not.

11         Q    Okay.   Concerning the fibers -- the fiber

12     evidence in the Bragdon case, did you do any tests

13     which would have involved certain melting point

14     analysis?

15         A    No, I did not.

16         Q    Okay, and is there a reason you did not?

17         A    It would have destroyed the fiber.

18         Q    Okay, and like I asked you relative to the

19     solubility test, was there any written or unwritten

20     protocol concerning not doing those kinds of exams?

21         A    I've never seen one.

22         Q    Okay.    In conducting your exams, you

1    mentioned that you had notes and then one machine

2    produced a chart itself.  Did you do any audio

3    recordings of your testing?

4         A    No.

5         Q    Okay.  Did anyone other than you prepare

6    your report relative to your microscopic comparison

7    and your microspectrophotometer exams?

8         A    You mean, my dictation?

9         Q    Yes.

10        A    No.

11        Q    Okay.  All right.  All right, are either of

12   the    microscopic    comparison    or    the

13   microspectrophotomter tests done more than once?

14        A    No, just once.

15        Q    What about any cross-section analysis, did

16   you do any cross-section analysis of the fiber

17   evidence?

18        A    No.

19             THE WITNESS:  Can I elaborate on that?

20             MS. POTOCZAK:  No.

21             THE WITNESS:  Okay.

22             BY MS. HOLDERMAN:

33

1        Q    Do you know who collected the evidence in

2    the Bragdon case?

3        A    By collected, you mean from the crime scene?

4        Q    Yes, and from the suspect, I guess.

5        A    I'm not certain but there is a -- the case

6    was assigned to a technician by the name of Crutchly.

7        Q    And the technicians would assist the

8    examiners; is that correct?

9        A    No.

10        Q    Okay.

11        A    I'm talking about a MPD Technician.

12        Q    Okay, sorry, I understand.  Okay.

13        A    When you say "collect evidence" --

14        Q    Yeah, I guess that's unclear.  It would be

15    two parts; one part at the scene and off of the

16    suspect and thereafter from the sample taken, whatever

17    fibers you would be testing.

18        A    Correct.

19        Q    Okay.

20        A    The initial collection I believe was

21    Crutchly.

22        Q    Okay.  Thank you.  Do you recall what the

1    results were that you came up with in the Bragdon case

2    relative to the fiber evidence?

3        A    There were four beige tri-lobal nylon carpet

4    fibers   which   exhibited   the   same   microscopic   and

5    optical  properties  as  did  the  fibers  from  Bragdon's

6    rug  and  therefore,  they  were  consistent  with  coming

7    from that rug.

8        Q    Okay, and relative to those tri-lobal carpet

9    fibers,  are  there  any  other  sources  for  such  matching

10   fibers other than Bragdon's rug?

11       MS. POTOCZAK:   Objection, and instruct the

12   witness not to answer.  It's within the purview of the

13   Judge's order keeping out the testimony and that's the

14   testimony, so I'm instructing you not to answer.

15       MS.   HOLDERMAN:    I'm   sorry,   I   don't

16   understand.

17       MS. POTOCZAK:  The Judge ruled on a Motion

18   for Summary Judgment and Absolute Immunity that he was

19   absolutely  immune  from  any  suit  that  involves  his

20   testimony  in  the  Bragdon  case.   That  question  is

21   encompassed  in  the  Bragdon  testimony  in  the  Superior

22   Court.   It's  out  of  the  case  and  I'm  not  going  to

1    allow him to testify about it unless the Judge orders

2    so.

3                MS. HOLDERMAN:   Okay, well, I'm not asking

4    him about his testimony.   I'm asking him --

5                MS. POTOCZAK:   That's a question right out

6    of the criminal testimony, I'm sorry.   And I'm going

7    to instruct him not to answer it and if you want you

8    can call Judge Robertson, but that's a question

9    literally right out of the testimony.

10               MS. HOLDERMAN:   I'm not asking him about his

11   testimony.

12               MS. POTOCZAK:   It's a question that the

13   prosecutor asked him.   His answer will -- I mean, it

14   just is and it's not going to happen.   Rephrase the

15   question.   I'm instructing him not to answer that

16   question.   Anything that's -- I will tell you that my

17   position in this case is anything that goes into his

18   testimony at the underlying criminal trial has been

19   ruled out of the case by absolute immunity and it's

20   out of the case.   So anything that involves his

21   testimony at the Superior Court trial is no longer in

22   this particular case.

1          MS. HOLDERMAN:  I can appreciate that but

2     I'm not asking him about his testimony at the Superior

3     Court trial.

4          MS. POTOCZAK:  The question you just asked

5     is the question out of the Superior Court testimony

6     trial.

7          MS. HOLDERMAN:  Could you just repeat that

8     question?

9          (The record was played back.)

10          (Off the record.)

11          MS. HOLDERMAN:  Back on the record.

12          BY MS. HOLDERMAN:

13     Q    Mr. Malone, you referred to something you

14     called the tri-lobal fiber.

15     A    Correct.

16     Q    Could you explain what that is?

17     A    Tri-lobal fiber is a fiber that has three

18     distinct lodes.  You can determine this by looking at

19     the fiber on the slides.

20     Q    Okay, and when you say three distinct lobes,

21     what does that mean?

22     A    It kind of looks like an airplane propeller

1    but with fat propellers.  In other words, you have --

2    it's difficult to explain, but you have -- instead of

3    being round, it has very distinct lobes or points.

4         Q    Are those points wound together?

5         A    No.

6         Q    Okay.  And are these -- in the Bragdon case

7    were these tri-level fibers manmade fibers?

8         A    Yes.

9         Q    Okay.  Are you able to observe the tri-lobal

10   fibers and their appearance without doing a cross-

11   sectional analysis?

12        A    Yes.

13        Q    Can you do a better analysis of a tri-lobal

14   fiber if you do a cross-section?

15        A    I don't know if it's better.  It's another

16   way to do it.

17        Q    Okay.  Is color an identifying factor of

18   tri-lobal fibers?

19        A    No.

20        Q    Okay, why not?

21        A    You mean to determine if it's tri-lobal

22   fibre?

1      Q    No, when you're looking at tri-lobal fiber,

2    would color be one of the things that you would mark

3    down?

4      A    Well, color is a characteristic that you

5    look at but it has nothing to do with it being a tri-

6    lobal.  In other words, any fiber can have color.

7      Q    Okay.  How is color analyzed looking at

8    fibers?

9      A    Two different ways; first with the

10    apochromatic lens system built into our comparison

11    microscopes.  Secondly, color is analyzed by

12    microspectrophotometer.

13      Q    Okay, and both of those ways were utilized

14    in the Bragdon case, correct?

15      A    Correct.

16      Q    Okay.  Now, with regard to the absorption

17    curve results, were those results reviewed by anyone

18    other than you in Bragdon's case?

19      A    They should have been reviewed by the unit

20    chief.

21      Q    If you looked at your notes, would you be

22    able to make that determination?

1        A    All right, we're going back to square one.

2    I think she did but because of a characteristic I

3    can't be sure. Is that fair?

4            MS. POTOCZAK:  I don't know.

5            BY MS. HOLDERMAN:

6        Q    Did you do any test to identify the type of

7    nylon fibers found in the Bragdon case?

8        A    Other than determining it was nylon, no.

9        Q    Okay.  What tests could you have done?

10       A    If I wanted to destroy the fiber, I could

11    have done an FTIR.  If I wanted -- again, to destroy

12    the fiber, I could have done a melting point.

13       Q    Okay.  Did you say FTIR?

14       A    FTIR, it's an infrared analysis.

15       Q    Okay.  Is there any reason why that was not

16    done in the Bragdon case?

17       A    Number one, it was not our procedure to do

18    it.    Number two,  it  would  have  destroyed  the

19    microscopic characteristics of the fiber.

20       Q    Okay.  Are there any other types of fiber

21    besides carpet fiber made in a tri-lobal shape?

22       A    I believe there are.  I know which ones

1    aren't.    However,   none   of   them   have   the   same

2    characteristics of a carpet fiber.

3         Q    And which characteristics do you refer to?

4         A    Referring to the size.   A carpet fiber is

5    many, many times larger than a normal textile fiber.

6         Q    Can a microspectrophotometer detect one dye

7    from other dyes that exist?

8         A    It can distinguish one dye from other dyes.

9         Q    Is that difficult?

10        A    Well, that's why we had it.   That's what I

11   was told when I was trained on it, that it could

12   distinguish various dyes by their dye color.

13        Q    All right, following the Bragdon case, did

14   you ever learn anything to the contrary?

15        A    No.

16        Q    Okay.   Are   there   any   other   ways   to

17   chemically test or analyze fibers to determine their

18   similarity other than the ones we've discussed that

19   you know of?

20        A    There are some outdated tests.   It's called

21   dye-stripping, but   since   the   introduction   of   the

22   microspectrophotometer nobody uses it.   There may be

1    some exotic tests I don't know about.

2        Q    Okay, fair enough.  What is the anometric-

3    20?  Anometric 20?

4        A    I don't know.

5        Q    Is that some kind of scientific graph?

6        A    I don't know what it is.

7        Q    Okay.  What is a rep sample?

8        A    Rep sample is if let's suppose you have

9    literally hundreds of hairs or hundreds of fibers on

10   an object.  Instead of collecting them all, you'll

11   collect a portion of them to represent all of them.

12   And that's called a rep sample, it's representative

13   sample.

14       Q    Okay.  And would that rep sample be

15   collected from different parts of the item or

16   different areas on the item?

17       A    Well, the whole item would be processed.  At

18   the end of the process, the hairs and fibers end up in

19   a little plastic pillbox.  Instead of pulling out

20   hundreds of them and mounting them, you would mount

21   maybe a dozen as a representative sample of what was

22   in there.

1        Q    Okay.  Were you working at the FBI crime lab

2    when the laboratories came under attack?

3        A    No.

4        Q    Okay.  But you know what I'm referring to

5    about the labs coming under public attack?

6        A    The  Inspector  General's  investigation,

7    correct.

8        Q    Okay, and do you know what started all of

9    that Inspector General inquiry?

10        A    I don't have first-hand knowledge.  The --

11            MS. POTOCZAK:  No gossip or innuendo in a

12    deposition transcript.  You either know or you don't.

13            THE WITNESS:  First-hand knowledge, no, I

14    don't.

15            BY MS. HOLDERMAN:

16        Q    Okay.  Do you have any belief about what

17    started it all?

18        A    I believe an Agent by the name of Fred

19    Whitehurst submitted some complaints to the Inspector

20    General's office.

21        Q    Okay.  What happened after the Inspector

22    General -- what do you know happened after the

1       Inspector General performed its review at the lab.

2             A     He issued a report.

3             Q     Okay, have you ever read that report?

4             A     I've read a portion.

5             Q     What portion did you read?

6             A     The portion that applied to me.

7             Q     Okay.     And   can   you   tell   me   your

8       understanding of that part of the report?  And by that

9       report, I did find the title and for the record that

10      would be, the report's called "The FBI Laboratory and

11      Investigation   into   Laboratory   Practices   and   Alleged

12      Misconduct in Explosive-Related and other Cases".   It

13      was issued in April of 1997.  And your portion of that

14      report gives you what understanding of the Inspector

15      General's conclusions about you or your work?

16            A     It was in the Allison Hastings' case.  I did

17      a leather exam.  Another agent assisted me in breaking

18      a strap as a control.  When I was asked by the Judges

19      whether or not I did the exam, I said I did, but I did

20      not tell them about this agent that assisted me and I

21      believe the second thing was the prosecutor -- not the

22      prosecutor, the agent handling -- not the agent, the

1    lawyer handling the case I'd had a pretrial conference

2    with him before I testified and I did tell him about

3    the other agent's involvement.  When they went back

4    and asked the lawyer, he said he could not remember me

5    doing so.  So because of these two incidents, they

6    said I gave false testimony during the inquiry.

7         Q    Okay, did anything happen as a result of

8    those Inspector General findings on the Hastings case?

9         A    No, no disciplinary action of any kind was

10   taken against me.

11        Q    Okay, and that would include no letters of

12   censure?

13        A    That's correct.

14        Q    Okay.  Did you perform solubility tests on

15   other cases that you reviewed at the time of the

16   Bragdon case?

17        A    I don't understand the question.

18        Q    Were you conducting solubility exams on

19   other fiber evidence?

20        A    I did it routinely on all the fiber cases

21   where I made a match.

22        Q    Okay, I'm sorry.  I mean solubility tests of

1    the unknown samples, did you do solubility tests of

2    the unknown samples of evidence?

3        A    Normally, no.  I would do solubility tests

4    of the knowns.

5        Q    Right.  In what kind of case would you do a

6    solubility test on an unknown of a sample?

7        A    Well, I can't really remember doing one but

8    the only case I can imagine is if you had literally

9    hundreds of fibers to work with.

10       Q    Okay.  And would the same hold true for a

11   cross-sectional test?

12       A    I've only one cross-sections on two cases

13   that I can recall.  In either case, it was not to

14   determine the cross-sectional shape.  It was to try to

15   determine the manufacturer of the fiber.

16       Q    Following the Inspector General's 1997

17   report, did the FBI lab change any of its internal

18   procedures?

19       A    I don't know.

20       Q    Okay, and would that be because you were no

21   longer working in the lab?

22       A    Correct.

1      Q    Okay.    When    you    worked    at    the    FBI

2   laboratory, was the laboratory accredited?

3      A    If    you're    talking    about    the    ASCLD

4   accreditation, no, it was not accredited at that time.

5      Q    Do    you    have    any    idea    why    it    wasn't

6   accredited?

7      A    I think the big hangup was they could not

8   have    access    to    our    files    because    they    were    not

9   cleared.

10      Q    Okay.    And since the 1997 report from the

11   Inspector General, has the FBI lab become accredited?

12      A    I don't know.

13      Q    So you are not aware whether or not the FBI

14   lab is now accredited.

15      A    That's correct.

16      Q    Okay.  Do you remember -- strike that.

17          When  you  tested  the  fibers  in  the  Bragdon

18   case, did you measure the diameter of the fibers?

19      A    Yes, I did.

20      Q    Did you try to determine the type of nylon

21   that these fibers were?

22      A    Other than determining they were nylon, no.

1    That's as far as I took it.

2        Q    Okay, are there different or varying kinds

3    of nylon?

4        A    The only one I'm aware of, there can be a

5    nylon-6 and a nylon-6.6.

6        Q    But you don't know which type of nylon was -

7    - the evidence was in the Bragdon case, correct?

8        A    No, I do not.

9        Q    Have you been deposed before?

10       A    Many times.

11       Q    All right.  Have you been deposed since your

12   retirement from the FBI?

13       A    No.

14       Q    Did you ever discuss the findings of Steve

15   Robertson relative to your work in the Bragdon case

16   with anyone other than your lawyer?

17       A    No one other than my lawyer.

18       Q    Okay.  Were you ever contacted by the FBI

19   after Steve Robertson's review of your work in the

20   Bragdon case  and  advised  of  Mr.  Robertson's

21   conclusions?

22       A    No.

1    Q    Okay.    You have had an opportunity,

2    however, to look at his report, correct?

3    A    Yes, I have.

4    Q    Okay.  Do you know who Agent Deedrick is?

5    A    Yes, I do.

6    Q    Can you tell me who he is?

7    A    He was a co-examiner in Hair and Fiber Unit

8    at the time of the Bragdon case.  I originally thought

9    he was a Unit Chief, but I don't think so.

10    Q    Okay.  Are you aware of whether Mr. Deedrick

11    had any involvement in the testing or analysis of

12    fibers found in the Bragdon case?

13    A    No, I did not.

14    Q    Do you believe Mr. Deedrick would be aware

15    of the procedures and protocol of the lab during the

16    time of the Bragdon case?

17    A    Yes, I did.

18    Q    You've testified that you've given many

19    depositions.  Do you remember the cases in which

20    you've been deposed?

21    A    All of the depositions that I've been

22    involved in besides this one were all in criminal

1   cases, most of them from the State of Florida because

2   Florida has a state law saying that a prosecutor

3   cannot use you or at least the defense has the chance

4   to depose you.  So many times, the prosecutor, defense

5   attorney from Florida fly up to the lab and depose

6   examiners.  That was -- all my depositions were in the

7   lab.

8        Q    Uh-huh.  Can you think of instances or

9   particular cases there were not Florida cases which

10  allowed in their system for depositions?

11       A    I don't -- there may have been, I don't

12  know.

13       Q    Okay, none that you recall right now.

14       A    Correct.

15            MS. HOLDERMAN:  All right.  I'd like to take

16  about a five or 10-minute break.  Is that okay with

17  everyone?

18            THE WITNESS:  That's fine.

19            MS. HOLDERMAN:  Thank you.

20            (A brief recess was taken.)

21            MS. HOLDERMAN:  On the record.

22            BY MS. HOLDERMAN:

1        Q    Mr. Malone, I only have just a couple more

2    questions for you.  I just asked you a little bit ago

3    of -- about Steve Robertson's report and whether or

4    not you'd seen it and I want to ask you about Mr.

5    Robertson's conclusions regarding the cross-sectional

6    shape of the fibers in the Bragdon case.  Do you

7    remember what those conclusions were by Mr. Robertson?

8        A    Other than him saying I should have done a

9    cross-section, no.

10       Q    Okay.  All right, did you do any of the

11   scraping to obtain the fiber evidence in the Bragdon

12   case?

13       A    No.

14            MS. HOLDERMAN:  I have nothing else for you.

15    I appreciate your time.

16            MS. POTOCZAK:  There were some questions

17   here and I'll leave this up to you really, because

18   maybe I would be under the protective order because

19   it's sort of addressed, some things at least

20   tangentially, but if you don't think it needs to be

21   under a protective order for FBI purposes, I'm

22   certainly not going to make life more complicated.

1          MR. BENSON:  It's been awhile since I've

2     looked at the protective order in this case, but it's

3     my understanding for the most part, the protective

4     order was a Privacy Act protective order and to the

5     extent that names and so forth were mentioned here

6     today, I believe they would be covered by the

7     protective order just as any other evidence.  I don't

8     believe the protective order only applies to

9     documents.  I believe it would apply to the testimony

10    of --

11         MS. POTOCZAK:  Right, and one question in

12    particular, there was a question about -- but see,

13    he's the party here, so that's why I'm not sure -- lab

14    ID initials are RQ and I mean, I don't really care

15    about it but --

16         MR. BENSON:  I don't think that we would

17    consider that information that was privileged in any

18    fashion.

19         MS. POTOCZAK:  Okay.

20         MR. BENSON:  And I didn't hear any other

21    evidence that wouldn't be normally testified in a

22    criminal trial about how they proceeded, so there's

52

1    nothing privileged that I was aware of today.

2             MS. POTOCZAK:  Okay, okay.

3             MS. HOLDERMAN:  Mr. Malone, your attorney

4    will explain to you that you have the opportunity to

5    review this transcript before it becomes final and you

6    can make a determination and let the Court Reporter

7    know with your counsel, whether or not you're going to

8    do that.

9             MS. POTOCZAK:  Read and sign in other words.

10    Do you want to read and sign?  Yes, you will read and

11   sign.  So we need a copy of the transcript.

12            MS. HOLDERMAN:  Okay, thank you all.

13            (Whereupon, at 12:17 p.m. the above-entitled

14   matter concluded.)

15

16

17

18

19

20

21

22